AMERICAN METAL PRODUCTS CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ADLER METAL PRODUCTS CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 64548, 64549. Filed April 21, 1960.

*B. L. Liberman, Esq.*, and *Gene M. Zafft, Esq.*, for the petitioners. *William H. Welch, Esq.*, for the respondent.

BRUCE, *Judge:* These consolidated proceedings involve deficiencies in income tax in the following amounts:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 64548 | American Metal Products Corporation | 1952 | $11,028.33 |
|  |  | 1953 | 10,263.06 |
|  |  | 1954 | 9,401.90 |
| 64549 | Adler Metal Products Corporation | 1952 | 9,672.25 |
|  |  | 1953 | 16,490.75 |
|  |  | 1954 | 11,193.94 |

The issues are: (1) Whether either of the petitioners was availed of during any of the taxable years in question for the purpose of preventing the imposition of the surtax, or "income tax," upon its shareholders by permitting earnings or profits to accumulate instead of being divided or distributed within the meaning of section 102, I.R.C. 1939, and sections 531–537, I.R.C. 1954; and (2) whether rental payments in excess of 20 cents per square foot per year by petitioners to Jack Adler are deductible as ordinary and necessary business expenses.

### FINDINGS OF FACT.

The facts stipulated are so found and are incorporated herein by this reference.

American Metal Products Corporation (hereinafter referred to as American Corporation) and Adler Metal Products Corporation (hereinafter referred to as Adler Corporation) are corporations organized and existing under the laws of the State of Missouri. They filed separate income tax returns for the years 1952, 1953, and 1954 with the director of internal revenue, St. Louis, Missouri.

American Corporation and Adler Corporation were organized October 25, 1934, and November 4, 1927, respectively. The authorized capital of each was originally $10,000, consisting of 100 shares of common stock, each share having a par value of $100. This authorized capital was subsequently increased by the issuance of stock dividends, so that since November 1940 Adler Corporation and American Corporation have had total capital stock outstanding in the respective amounts of $220,000 and $105,000. During the taxable years in issue all of the capital stock of Adler Corporation, except qualifying shares, was owned by Jack Adler (hereinafter sometimes referred to as Adler), who has been the president and chief executive officer of both corporations throughout their entire existence. The 1,050 shares of American Corporation were owned throughout the years here involved as follows: Jack Adler, 840 shares; Mary Ann

Adler (Jack Adler's wife), 105 shares; Edward A. Adler (Jack Adler's brother), 105 shares.

Adler Corporation manufactures and sells filing cabinets and other steel items that go into filing cabinets. It sells to both dealers and users, as well as to American Corporation, which purchases all of its products from Adler Corporation. American Corporation is primarily a retailer, although on occasion it also sells to dealers.

Adler Corporation was originally established in 1927 to manufacture radiator shells and covers, for use in homes and other buildings. At first Jack Adler leased a small plant from the Dean Metal Products Company. The plant contained 5,000 square feet. Shortly thereafter, Adler bought the plant, as well as the machinery and equipment, from this company. Adler Corporation has used this machinery and equipment ever since. In 1931 Adler Corporation started manufacturing filing cabinets and has manufactured them since with the exception of a period of time during World War II when it suspended operations due to its inability to obtain steel. In 1933 Adler Corporation bought all the dies and tools of a bankrupt concern known as "American Metal Products Corporation." In the following year, the petitioner American Corporation was formed.

In 1942 both corporations moved to a building owned by Adler and located at the corner of Laclede and Vandeventer Avenues in St. Louis, Missouri, where they have since carried on their operations. The building contains approximately 70,000 square feet of floor space, of which, pursuant to written leases, Adler Corporation rents approximately 50,000 square feet and American Corporation rents approximately 20,000 square feet. For each of the years from 1950 through 1956 the lease between Adler Corporation and Adler, dated April 5, 1949, as extended, provided for yearly rentals of $20,000, and the lease between American Corporation and Adler, dated April 4, 1949, as extended, provided for yearly rentals of $8,000. For the 8-month period, May 1, 1949, to December 31, 1949, the said leases provided for yearly rentals of $12,000 and $6,000, respectively. The respective rentals of $20,000 and $8,000 per year were at the rate of approximately 40 cents per square foot of floor space.

The pertinent portions of the minutes of a special meeting of the board of directors of the Adler Metal Products Corporation held on January 2, 1947, are as follows:

The President explained that since the corporation is a self-insuror on all of the property of the Company, including fire, theft, compensation and life insurance, he deemed it only proper that a reserve in a substantial amount be set up by the corporation to meet such contingencies. In discussing the matter, it was estimated that approximately $300,000.00 would be a reasonable reserve to set up by the corporation for such purposes. The President further explained that

provision should be made by the corporation for the purpose of acquiring a proper building in which to conduct its business. He felt that it would be necessary to purchase the building or buildings containing a minimum of 100,000 square feet, in order to properly carry on the business of the corporation. A fair estimate of the cost thereof was set at $6.00 per square foot or a total of $600,000.00, covering the approximate cost of the land and building or buildings thereon for such purposes. The President recommended that a reserve in the sum of $600,000.00 be set up by the corporation for such purposes.

The President further explained that the present machinery and equipment of the corporation was gradually becoming obsolete and worn out and that it would be necessary to replace the same with new equipment. He further explained that since it was contemplated by the corporation to expand its capacity and to manufacture additional items such as desks, lockers and similar items of office equipment, that a suitable reserve be set up by the corporation for such purposes. In discussing this matter, it was estimated that a reasonable sum to cover the cost of replacing the present equipment and adding such additional new machinery and equipment as may be necessary would be approximately $350,000.00. A plan was discussed with respect to the method and manner in which such reserve could be set up and it was the consensus of opinion that the corporation set aside each year so much of its earnings as the corporation can safely set aside for the purpose of accumulating these reserves. It was also the consensus of opinion that the President shall, at his option, make such expenditures at such times as he deems necessary, or to start any part of the plan into effect at such time as he deems proper, and to increase or decrease such amounts from time to time as he may in his judgment deem proper under existing circumstances at the time.

After the aforegoing expressions were given, the following Resolution was unanimously adopted.

"RESOLVED, That the corporation set up a reserve of $300,000.00 to cover all insurance risks of the corporation.

"BE IT FURTHER RESOLVED, That a reserve of $600,000.00 be set up by the corporation to cover the cost of acquiring a new building or buildings for use by the corporation.

"BE IT FURTHER RESOLVED, That a reserve of $350,000.00 be set up by the corporation for the purpose of defraying the cost of any machinery and equipment to replace obsolete equipment and to cover the cost of additional machinery and equipment for use by the corporation.

"BE IT FURTHER RESOLVED, That the corporation set aside towards such a reserve, such portion of its annual earnings as it may safely do, based upon the opinion of its President; and that the President of the corporation be and is hereby authorized and empowered to make the necessary expenditures at such time and under such circumstances as he deems necessary or to put into effect a plan or any part of a plan as to the proper time within which to make such expenditures and to increase or decrease the same based upon economic conditions generally, and in accordance with his best judgment and discretion."

At the meeting of the board of directors of the American Metal Products Corporation held on January 3, 1947, the following resolutions were adopted:

The President explained the purposes of the meeting in which attention was called to the fact that since the corporation was a self-insuror covering all

forms of insurance, that he deemed it proper for a reserve to be set up by the corporation to cover such item. This matter was discussed and it was estimated that the sum of $200,000.00 would be a reasonable amount to be set up as a reserve by the corporation to cover insurance.

The President then called attention to the fact that he deemed it advisable and that it was necessary for the proper operation of the business, that a small building be acquired, not to exceed approximately 50,000 square feet of space, to be used by the corporation for an advertising plant, and storage for the products handled by the corporation. This matter was discussed and it was estimated that a reasonable amount to set aside as a reserve for these purposes should be $300,000.00.

The President further explained that being a mail order house, the corporation will soon have to resort to storing merchandise in warehouses in various cities. Also, that it will be necessary to purchase for the proper operation of the business, mailing, printing and advertising equipment and that a reasonable reserve should be set up to cover such items. In discussing the matter, it was estimated that a reasonable amount to cover such items of expense to be set aside by the corporation as a reserve for such purposes should be $250,000.00.

The President also explained that in order for the corporation to function properly and to maintain a sizeable inventory to conduct its business, that a working capital of approximately $300,000.00 should be set up as a reserve for such purpose.

It was further the consensus of opinion by the Board that the corporation set aside each year so much of its earnings as a reserve for these purposes until the amounts stated shall have accumulated and that the amounts so to be set aside shall be determined by the President of the corporation; and that the President make such expenditures from time to time as he deems necessary or proper or to put into effect any plan for the same and to increase or decrease such amounts from time to time as he may in his judgment deem proper.

Thereafter, in line with the foregoing expressions, the following Resolution was unanimously adopted:

"RESOLVED, That the corporation set up a reserve of $200,000.00 to cover contingencies arising as the result of the corporation being a self-insuror.

"BE IT FURTHER RESOLVED, That the corporation set up a reserve of $300,000.00 to cover the costs of acquiring a proper building for the conduct of its business.

"BE IT FURTHER RESOLVED, That the corporation set up a reserve of $250,000.00 to cover the expense incident to acquiring printing, mailing, advertising and other equipment.

"BE IT FURTHER RESOLVED, That the corporation set up a reserve of $300,000.00 as working capital of the corporation.

"BE IT FURTHER RESOLVED, That the corporation set aside towards such funds, so much of its annual earnings each year as the President may, in his discretion, deem proper and that the President be authorized and empowered to make the necessary expenditures at such time and under such circumstances as he deems necessary and proper or to put into effect any plan for the same, and to increase or decrease such amounts from time to time, depending upon economic conditions generally, as he, the President, may in his judgment deem proper."

During the taxable years in issue returns were filed on a calendar year basis. Adler Corporation's balance sheets at the close of the taxable years 1951, 1952, 1953, and 1954 show the following assets and liabilities:

|  | December 31— | | | |
|---|---|---|---|---|
|  | 1951 | 1952 | 1953 | 1954 |
| *Assets* | | | | |
| Cash | $32,029.06 | $46,487.28 | $21,010.29 | $8,133.12 |
| Dep. coll. int. rev | 88,000.00 | 88,000.00 | | |
| U.S. Treas. bond | 629,000.00 | 629,000.00 | 725,000.00 | 813,978.50 |
| Acc. int.–U.S. bonds | 3,076.06 | 3,360.07 | 9,261.18 | 2,823.20 |
| Accts. rec.-other | | 6,638.30 | 3,015.98 | 8,489.76 |
| Accts. rec.-Amer. Metal | 94,538.18 | 66,037.50 | 116,955.85 | 38,754.88 |
| Inventories | 71,225.00 | 62,910.45 | 28,460.25 | 25,325.00 |
| Improvements & equip | 25,219.55 | 25,412.33 | 29,631.73 | 34,366.23 |
| Total | 943,087.85 | 927,845.93 | 933,335.28 | 931,870.69 |
| *Liabilities* | | | | |
| Accts. pay | 358.31 | 389.16 | 2,188.09 | 337.87 |
| Accrued inc. taxes | 52,585.27 | 25,099.86 | 27,811.91 | 7,777.60 |
| Dep.-reserve | 23,408.35 | 23,958.25 | 25,400.54 | 27,684.95 |
| Cap. stock-orig | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 |
| Stock div | 210,000.00 | 210,000.00 | 210,000.00 | 210,000.00 |
| Surplus and surplus reserves | 646,935.92 | 658,398.66 | 657,934.74 | 676,070.27 |
| Total | 943,287.85 | 927,845.93 | 933,335.28 | 931,870.69 |

American Corporation's balance sheets at the close of the taxable years 1951, 1952, 1953, and 1954 show the following assets and liabilities:

|  | December 31— | | | |
|---|---|---|---|---|
|  | 1951 | 1952 | 1953 | 1954 |
| *Assets* | | | | |
| Cash | $70,221.69 | $70,290.17 | $55,792.71 | $14,854.02 |
| Dep. coll. of int. rev | 56,000.00 | 56,000.00 | | |
| U.S. bonds & notes | 525,000.00 | 525,000.00 | 650,000.00 | 649,276.00 |
| Accts. rec | 20,954.28 | 29,573.66 | 16,508.34 | 8,566.22 |
| Deferred chgs | 1,943.52 | 3,742.18 | 8,910.28 | 2,812.50 |
| Inventory | 16,800.00 | 7,529.43 | 165.75 | |
| Total | 690,919.49 | 692,135.44 | 731,377.08 | 675,508.74 |
| *Liabilities* | | | | |
| Adler Metal Products | 85,245.38 | 66,059.96 | 116,955.85 | 38,758.74 |
| Bad debt res | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| Res.-income tax | 43,712.57 | 33,494.55 | 18,593.87 | 15,722.27 |
| Cap. stock-paid in | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 |
| Cap. stock-dividend | 95,000.00 | 95,000.00 | 95,000.00 | 95,000.00 |
| Surplus & surplus reserves | 455,961.54 | 486,580.93 | 489,827.36 | 515,027.73 |
| Total | 690,919.49 | 692,135.44 | 731,377.08 | 675,508.74 |

Petitioners' inventories as of the close of each taxable year from 1946 to 1954, inclusive, and their net sales for each of said years were as follows:

| Year | Adler Corporation | | American Corporation | |
|---|---|---|---|---|
|  | Inventory | Net sales | Inventory | Net sales |
| 1946 | $23,985.00 | $352,695.50 | | $418,021.70 |
| 1947 | 34,166.00 | 584,142.03 | | 425,448.15 |
| 1948 | 87,297.00 | 406,074.18 | | 297,994.60 |
| 1949 | 56,750.00 | 391,921.43 | $3,000.00 | 364,683.77 |
| 1950 | 50,001.62 | 343,257.81 | 3,000.00 | 317,156.49 |
| 1951 | 71,225.00 | 287,143.36 | 16,800.00 | 289,315.21 |
| 1952 | 62,910.45 | 271,789.05 | 7,529.43 | 310,095.99 |
| 1953 | 28,460.25 | 230,644.91 | 165.75 | 295,237.66 |
| 1954 | 25,325.00 | 161,318.68 | | 146,798.80 |

Adler Corporation's improvements and equipment account and Adler Corporation's reserve for depreciation account (American Corporation did not have such accounts), Adler Corporation's accounts receivable account other than American Corporation, and American Corporation's accounts receivable account as of the close of each of the taxable years 1946 to 1954, inclusive, were as follows:

| Year | Adler Corporation | | | American Corporation |
|---|---|---|---|---|
| | Improvements and equipment | Reserve for depreciation | Accounts receivable, other | Accounts receivable |
| 1946 | $23,099.05 | $17,102.27 | $9,252.71 | $20,524.81 |
| 1947 | 23,099.05 | 18,891.17 | 18,776.71 | 26,203.95 |
| 1948 | 23,099.05 | 20,680.07 | 20,258.03 | 19,021.34 |
| 1949 | 24,849.05 | 22,367.27 | 17,211.44 | 37,540.48 |
| 1950 | 25,219.55 | 22,852.90 | | 26,892.42 |
| 1951 | 25,219.55 | 23,408.35 | | 20,954.28 |
| 1952 | 25,412.33 | 23,958.25 | 6,638.30 | 29,573.66 |
| 1953 | 29,631.73 | 25,400.54 | 3,015.98 | 16,508.34 |
| 1954 | 34,366.23 | 27,684.95 | 8,489.76 | 8,566.22 |

The following schedule (Jt. Ex. 9–I) is an analysis of the surplus account of Adler Corporation covering the period October 31, 1935, to December 31, 1954:

| Year or period ended— | Net income after taxes | Adjustments credit (debit) | Dividends | Balance |
|---|---|---|---|---|
| 10/31/35 | | | | $46,725.74 |
| 10/31/36 | $49,275.53 | | | 96,001.27 |
| 10/31/37 | 32,839.03 | $291.00 | a $90,000.00 | 39,131.30 |
| 10/31/38 | 30,211.30 | (825.00) | | 68,517.60 |
| 10/31/39 | 32,526.78 | | a 50,000.00 | 51,044.38 |
| 10/31/40 | 51,855.87 | 1,191.96 | a 50,000.00 | 54,092.21 |
| 10/31/41 | 59,967.33 | b (8,217.13) | a 20,000.00 | 85,842.41 |
| 10/31/42 | 39,659.23 | | | 125,501.64 |
| 10/31/43 | (14,501.08) | c (6,834.74) | | 104,165.82 |
| 10/31/44 | (30,099.18) | d (3,003.86) | | 71,062.78 |
| 10/31/45 | 17,957.42 | | | 89,020.20 |
| 12/31/45 | 2,840.04 | | | 91,860.24 |
| 12/31/46 | 90,885.80 | | | 182,746.04 |
| 12/31/47 | 183,404.74 | | | 366,150.78 |
| 12/31/48 | 88,455.47 | | | 454,606.25 |
| 12/31/49 | 86,170.74 | | | 540,776.99 |
| 12/31/50 | 88,867.93 | | 22,000.00 | 607,644.92 |
| 12/31/51 | 61,291.00 | | 22,000.00 | 646,935.92 |
| 12/31/52 | 33,462.74 | | 22,000.00 | 658,398.66 |
| 12/31/53 | 36,541.96 | d (37,005.88) | | 657,934.74 |
| 12/31/54 | 18,135.53 | | | 676,070.27 |

a. Dividends paid in stock.
b. Includes additional Federal tax of $8,474.45.
c. Includes additional Federal tax of $7,726.82.
d. Additional Federal tax.

In Adler Corporation's return for 1953, under "Schedule M—Reconciliation of net income and analysis of earned surplus and undivided profits," item 12, "Other unallowable deductions," the amount $37,005.88 is described as "Sect 102 Tax."

The following schedule (Jt. Ex. 10–J) is an analysis of the surplus account of American Corporation covering the period October 31, 1935, to December 31, 1954:

| Year or period ended— | Net income after taxes | Adjustments credit (debit) | Dividends | Balance |
|---|---|---|---|---|
| 10/31/35 | | | | $4,451.31 |
| 10/31/36 | $22,218.60 | | | 26,669.91 |
| 10/31/37 | 18,023.58 | ($1,398.68) | a $22,500.00 | 20,794.81 |
| 10/31/38 | 18,823.95 | 640.00 | | 40,258.76 |
| 10/31/39 | 22,597.68 | | a 30,000.00 | 32,356.44 |
| 10/31/40 | 22,089.28 | 1,653.23 | a 32,500.00 | 24,098.95 |
| 10/31/41 | 40,222.36 | b (20,536.90) | a 10,000.00 | 33,784.41 |
| 10/31/42 | 26,612.38 | | | 60,396.79 |
| 10/31/43 | 5,413.84 | c (3,243.51) | | 62,567.12 |
| 10/31/44 | (4,459.00) | c (780.52) | | 57,327.60 |
| 10/31/45 | 11,107.78 | | | 68,435.38 |
| 12/31/45 | 865.13 | | | 69,300.51 |
| 12/31/46 | 78,297.96 | | | 147,598.47 |
| 12/31/47 | 109,849.94 | c (6,761.11) | | 250,687.30 |
| 12/31/48 | 67,342.79 | | | 318,030.09 |
| 12/31/49 | 47,165.02 | | | 365,195.11 |
| 12/31/50 | 58,957.87 | | 10,500.00 | 413,652.98 |
| 12/31/51 | 52,808.56 | | 10,500.00 | 455,961.54 |
| 12/31/52 | 41,119.39 | | 10,500.00 | 486,580.93 |
| 12/31/53 | 27,725.44 | c (24,479.01) | | 489,827.36 |
| 12/31/54 | 25,200.37 | | | 515,027.73 |

a. Dividends paid in stock.
b. Principally additional Federal taxes.
c. Additional Federal taxes.

In American Corporation's return for 1953, under "Schedule M—Reconciliation of net income and analysis of earned surplus and undivided profits," item 12, "Other unallowable deductions," the amount $24,479.01 is described as "Sect 102 Tax."

Pursuant to the corporate resolutions of January 1947, both corporations made various journal entries with respect to surplus reserves.

The surplus reserves of Adler Corporation at the close of the taxable years 1951, 1952, and 1953 were composed of the following items:

| Item | Amount |
|---|---|
| Special reserve | $155,000.00 |
| Laister-Kaufman | 48,849.76 |
| Machinery and real estate | 250,000.00 |
| Insurance | 75,000.00 |
| Total | 528,849.76 |

In 1954 Adler Corporation made a journal entry increasing the special reserve from $155,000 to $170,000, thus increasing the total surplus reserves at the close of 1954 to $543,849.76.

The surplus reserves of American Corporation at the end of each of the taxable years 1951, 1952, and 1953 were composed of the following items:

| Item | Amount |
|---|---|
| Special reserve | $75,000 |
| Special reserve for insurance | 50,000 |
| Special reserve for equipment | 175,000 |
| Total | 300,000 |

In 1954 American Corporation made a journal entry increasing the special reserve from $75,000 to $90,000, thus increasing the total surplus reserves at the close of 1954 to $315,000.

Adler Corporation and American Corporation paid Jack Adler a total of $76,500 during each of the taxable years in salary, bonus,

and rent. From the date of its organization Adler Corporation has paid cash dividends only in the taxable years 1950, 1951, and 1952. In each of those years it paid $22,000. Similarly, American Corporation has paid cash dividends only in the taxable years 1950, 1951, and 1952, and in each of those years it paid $10,500.

Adler does all the buying and selling for both companies. In the office the petitioners have only one or two girls, in addition to Adler and an auditor who comes in and checks the books occasionally.

Respondent notified both Adler Corporation and American Corporation on April 17, 1956, pursuant to section 534, I.R.C. 1954, that he proposed to issue a statutory notice of deficiency for the taxable years 1952, 1953, and 1954 relating to the accumulated earnings tax under sections 102, I.R.C. 1939, and 531, I.R.C. 1954. Petitioners made timely replies to these notices on May 10, 1956. Subsequent thereto, on July 13, 1956, respondent issued to each of the petitioners a statutory notice of deficiency wherein, in addition to certain minor adjustments, he determined that the fair rental for the property rented by each of the petitioners did not exceed $10,000 and $4,000 per year, respectively; and further determined, as to each of the petitioners for each of the years involved, "that you were availed of for the purpose of preventing the imposition of the surtax upon your shareholders through the medium of permitting earnings or profits to accumulate beyond the reasonable needs of your business instead of being distributed and that you are, therefore, liable for the surtax provided in Section 102 of the Internal Revenue Code of 1939 and Section 531 of the Internal Revenue Code of 1954."

Adler Corporation was availed of during each of the years 1952 and 1954, and American Corporation was availed of during each of the years 1952, 1953, and 1954, for the purpose of preventing the imposition of the surtax, or "income tax," upon their respective shareholders by permitting earnings or profits to accumulate beyond the reasonable needs of the business instead of being divided or distributed. Adler Corporation was not so availed of during the year 1953.

During the taxable years 1952, 1953, and 1954, rentals paid by Adler Corporation and American Corporation in the respective amounts of $20,000 and $8,000 were required to be made as a condition to the continued use and possession of the property leased from Jack Adler.

#### OPINION.

Respondent determined that during each of the taxable years 1952, 1953, and 1954, each of the petitioners was availed of for the purpose of preventing the imposition of the surtax (or "income tax") upon its shareholders by permitting earnings and profits to accumulate beyond the reasonable needs of its respective business instead of being

divided or distributed and that each of the petitioners is accordingly liable for the surtax imposed under section 102, I.R.C. 1939, or for the accumulated earnings tax imposed under section 531, I.R.C. 1954.[1]

In defense of their accumulations petitioners generally contend that they each required approximately $1 million for purposes of expansion and rehabilitation. Respondent's position is that petitioners' plans for expansion were vague, indefinite, and, in short, nothing more than a nebulous idea in the mind of Jack Adler, the controlling stockholder and president of both corporations.

We think it quite clear that neither of petitioners reasonably needed amounts in excess of the accumulated earnings and profits available to them at the beginning of the taxable years under consideration.

Preliminarily, petitioners raise the issue as to whether the burden of proof has been shifted under the provisions of section 534 of the 1954 Code.[2] Respondent sent petitioners notifications pursuant to

---

[1] SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS.

(a) IMPOSITION OF TAX.—There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation (other than a personal holding company as defined in section 501 or a foreign personal holding company as defined in Supplement P) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following:

27½ per centum of the amount of the undistributed section 102 net income not in excess of $100,000, plus

38½ per centum of the undistributed section 102 net income in excess of $100,000.

[Section 531 of the 1954 Code imposes for each taxable year an "accumulated earnings tax" (called "surtax" under the 1939 Code) on the "accumulated taxable income" ("net income" under the 1939 Code) of every corporation (excepting those enumerated under section 532(b) formed or availed of for the purpose of avoiding the "income tax" ("surtax" under the 1939 Code)) with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed.]

[2] SEC. 534. BURDEN OF PROOF.

(a) GENERAL RULE.—In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall—

(1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or

(2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection.

(b) NOTIFICATION BY SECRETARY.—Before mailing the notice of deficiency referred to in subsection (a), the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. In the case of a notice of deficiency to which subsection (e)(2) applies and which is mailed on or before the 30th day after the date of the enactment of this sentence, the notification referred to in the preceding sentence may be mailed at any time on or before such 30th day.

(c) STATEMENT BY TAXPAYER.—Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business.

section 534(b) and petitioners now contend that their timely statements in reply thereto complied with section 534(c), thereby shifting to the respondent the burden of proving the accumulations to be beyond the petitioners' reasonable needs.

The ultimate burden of proving that petitioners were not availed of for the prohibited statutory purpose is and remains upon petitioners. *Pelton Steel Casting Co.*, 28 T.C. 153, affd. 251 F. 2d 278 (C.A. 7, 1958), certiorari denied 356 U.S. 958. Thus, in any event, petitioners, by complying with section 534, could only shift the limited burden of proof pertaining to accumulations beyond the reasonable needs of their businesses. Even this, however, they have not done.

In order to shift the limited burden of proof under section 534(c) the taxpayer must submit a timely "statement of the *grounds* (together with the *facts* sufficient to show the basis thereof)." (Emphasis added.) Even if petitioners' statements could be said to comply with the "grounds" requisite of section 534(c), the supporting facts are not "sufficient to show the basis" of such grounds. See *Wellman Operating Corporation*, 33 T.C. 162; *I. A. Dress Co.*, 32 T.C. 93, affd. 273 F. 2d 543; *Dixie, Inc.*, 31 T.C. 415, on appeal (C.A. 2).

In their section 534(c) statements petitioners contended that their accumulations were based on reasonable need for the following "grounds" and in the following amounts:

|  | Adler Corporation | American Corporation |
|---|---|---|
| Inventory requirements | $471,250 | $375,000 |
| Machinery and equipment | 400,000 |  |
| Repairs and addition to plant | 200,000 |  |
| Accounts receivable |  | 200,000 |
| Expansion and warehousing |  | 200,000 |
| Advertising and printing plant |  | 300,000 |
| Total | 1,071,250 | 1,075,000 |

All of the "grounds" alleged in petitioners' statements are entirely contingent on expansion and rehabilitation of petitioners' existing facilities. While there is little doubt that a corporation's earnings and profits may be accumulated for purposes of expansion and modernization, see *Crawford County Printing & Publishing Co.*, 17 T.C. 1404, such "grounds" must be supported by substantial, material, and definite facts and by clear and specific plans. See *Wellman Operating Corporation, supra; I. A. Dress Co., supra; Dixie, Inc., supra; Latchis Theatres of Keene, Inc.*, 19 T.C. 1054, affd. 214 F. 2d 834 (C.A. 1, 1954); *Gus Blass Co.*, 9 T.C. 15; *Whitney Chain & Mfg. Co.*, 3 T.C. 1109, affd. 149 F. 2d 936. Neither in their statements nor at trial did petitioners present facts or plans of the requisite specificity.

In their section 534 statements Adler Corporation and American Corporation alleged that they needed $471,250 and $375,000, respectively, for inventory requirements. These amounts are completely out of proportion with the largest inventory held by Adler Corporation at the close of any year from October 31, 1943, to December 31, 1954, which was in the amount of $87,297 on December 31, 1948. Adler Corporation's largest amount of sales for any one year was $584,142.03 in 1947 and the alleged requirement of $471,250 is larger than the total sales for any year with the exception of 1947. American Corporation had no inventories for the years 1946 through 1948 and only nominal inventories at the end of the years 1949 to 1953. It had no inventory at the end of 1954. Furthermore, it is significant to note that all of American Corporation's merchandise was purchased from Adler Corporation and that the 1947 minutes of the Adler Corporation made no mention of inventory requirements.

The record does not support Adler Corporation's contention that it required $400,000 for machinery and equipment. Its balance sheets show that the total cost of equipment used by it through the year 1954 was only $34,366.23. For purposes of this trial, Adler Corporation hired a firm to determine the replacement cost of its equipment as of December 31, 1954. Since this report is based upon the premise that Adler Corporation would replace all its equipment with new equipment it is significant to note that Adler Corporation had never purchased any new equipment. The used equipment purchased at bankruptcy sales at the time of its incorporation had been used continuously since that time. There is little indication that all the equipment needed replacement or that Adler Corporation intended to replace it. Petitioners' estimates for new machinery and equipment may well have been correct, but they were not the considerations upon which their accumulations of earnings were made. "The controlling intention of the taxpayer is that which is manifested at the time of the accumulation, not subsequently declared intentions which are merely the products of afterthought." *Smoot Sand & Gravel Corp.* v. *Commissioner*, 241 F. 2d 197, 202 (C.A. 4, 1957).

With respect to Adler Corporation's contention that it needed $200,000 for repairs and additions to plant it should be noted that it has always occupied premises owned by its president. It is reasonable to assume, in the absence of evidence to the contrary, that it would continue to follow the same practice.

American Corporation alleged that it needed $200,000 to finance its accounts receivable. The largest amount of accounts receivable carried by the company at the close of any year from October 31, 1943, to December 31, 1954, was $37,540.48 on December 31, 1949. This contention, as well as its contention that it needed $300,000 for ad-

vertising and printing plant and $200,000 for expansion and warehousing, and all of Adler Corporation's contentions, excepting that contention relating to self insurance, were contingent upon petitioners' expansion.

In order to establish their intent to expand, petitioners heavily rely on their corporate minutes of January 1947. These minutes, however, clearly lack the requisite specificity. They fail to state substantial and material facts with respect to the reasonable need for the reserves, their component parts, or the method by which they were determined. They give little indication as to what types of buildings, machinery, and equipment were contemplated. The record does not show that any outside consultant, architect, realtor, or contractor was engaged in order to give their plans some semblance of clarity, specificity, and actuality. There were no independent estimates on which petitioners might reasonably have relied as a reason for accumulating earnings in the scale and manner in which they accumulated them. If indeed there actually was discussion among petitioners' directors, as the minutes would seem to indicate, there certainly was little or no planning for, or formulation, authorization, or execution of any specific commitment.

The formal resolutions establishing the reserves and any formal book entries thereunder do not of themselves substantiate the petitioners' purported objectives of rehabilitation and expansion. "The intention claimed must be manifested by some contemporaneous course of conduct directed toward the claimed purpose." *Smoot Sand & Gravel Corp.* v. *Commissioner, supra* at 202.

Furthermore, although we hesitate to substitute our opinion as to the propriety of "accumulation" as a means of financing expansion or as to the reasonableness of the amounts for the opinion of corporate officers and directors who have expressly considered these matters and exercised their business judgment regarding the same, see *Breitfeller Sales, Inc.*, 28 T.C. 1164; *Crawford County Printing & Publishing Co., supra;* we are not required to automatically accept the decisions of interested officers as the lodestone of reasonable need. See *Trico Products Corporation*, 46 B.T.A. 346, affd. 137 F. 2d 424 (C.A. 2, 1943), certiorari denied 320 U.S. 799; *L. Schepp Co.*, 25 B.T.A. 419.

Since at least 1946 or 1947 petitioners have accumulated for the alleged purposes of rehabilitation and expansion. During the entire period of time since then, even up to the time of trial, petitioners have been unable to expand, according to their contention, for the single reason that the proper type of steel was unavailable. Solely for this reason was petitioners' expansion always indefinitely postponed. While we recognize that steel may have been difficult to

obtain during the Korean conflict, petitioners have not established that steel was unavailable to them during all the years since 1946. Such a continuously asserted reason for failure to expand over a period of so many years is a strong indication of indefinite postponement of any purported plans beyond the foreseeable future and, in view of a complete absence of specific plans, precludes a finding of reasonable business need, either immediate or reasonably anticipated.

At trial petitioners raised an additional "ground" for accumulation. Adler Corporation contended that it needed a reserve for self insurance in the amount of $300,000. A reserve in this amount does not appear to be reasonable under the instant circumstances. Petitioners' president testified that the premiums which petitioners would otherwise have had to pay were $10,000 or $12,000 per year. Adler Corporation already had a reserve of $75,000 for insurance established on its books and the record does not indicate it had previously suffered any substantial losses. In the absence of more convincing evidence to the contrary, it appears that petitioners were adequately covered by the portion of earnings retained prior to the years in question.

The record clearly indicates that the financial position of each of the petitioner corporations at the beginning of and during each of the taxable years under consideration was adequate to meet its reasonable needs, both immediate and reasonably anticipated.

It is equally clear that Adler Corporation accumulated earnings or profits, during each of the years 1952 and 1954, which were beyond the reasonable needs of its business, and that American Corporation accumulated earnings or profits, during each of the years 1952, 1953, and 1954, which were beyond the needs of its business.

With the exception of Adler Corporation in the year 1953 (hereinafter discussed), both corporate petitioners, since their incorporation, have consistently accumulated earnings or profits rather than paying them out in dividends. Cash dividends were paid by them only in 1950, 1951, and 1952, during each of which years Adler Corporation paid dividends in the amount of $22,000, and American Corporation paid dividends in the amount of $10,500.

As of the end of 1951, Adler Corporation had accumulated earnings and profits of $646,935.92 in surplus and surplus reserves. It had $658,398.66 in surplus and surplus reserves at the end of 1952, $657,934.74 at the end of 1953, and $676,070.27 at the end of 1954. These amounts were in addition to $210,000 in earnings and profits which it had capitalized prior to 1951 by the issuance of stock dividends. It had $629,000 invested in United States Government bonds at the end of 1951 and 1952, $725,000 at the end of 1953, and $813,-

978.50 at the end of 1954. Except for accrued income taxes, its only liabilities at the end of 1952, 1953, and 1954, were accounts payable in the amounts of $389.16, $2,188.09, and $337.07, respectively. The ratios of Adler Corporation's current assets to current liabilities at the end of the years 1952, 1953, and 1954, were 33 to 1, 26 to 1, and 106 to 1, respectively.

As of the end of the year 1951, American Corporation had accumulated earnings and profits of $455,961.54 in surplus and surplus reserves. It had $486,580.93 in surplus and surplus reserves at the end of 1952, $489,827.36 at the end of 1953, and $515,027.73 at the end of 1954. These amounts were in addition to $95,000 in earnings and profits which it had capitalized prior to 1951 by the issuance of stock dividends. It had $525,000 invested in United States Government bonds at the end of 1951 and 1952, $650,000 at the end of 1953, and $649,276 at the end of 1954. Except for accrued income taxes and an account payable to Adler Corporation it had no liabilities at the end of any of these years. Excluding the account payable to Adler Corporation, the ratio of American Corporation's current assets to its current liabilities at the end of the years 1952, 1953, and 1954, were 21 to 1, 39 to 1, and 43 to 1, respectively.

During each of the taxable years petitioners paid Jack Adler an aggregate amount of $76,500 in salary and rent. During the years 1952, 1953, and 1954, Adler was in the tax brackets of 77 per cent, 72 per cent, and 72 per cent, respectively, and had petitioners distributed all their earnings to Adler during said years, Adler and his wife would have been subject to additional income taxes of $27,784.90, $43,484.44, and $23,968.30, respectively.

Under section 102(c) of the 1939 Code and section 533(a) of the 1954 Code, the fact that earnings or profits of a corporation have been permitted to accumulate beyond the reasonable needs of the business is, of itself, determinative of the purpose to avoid surtax upon its shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary.

Except for the year 1953 in the case of Adler Corporation (hereinafter discussed), neither of the petitioners has proven to the contrary with respect to any of the years in issue. The evidence clearly establishes, and we so hold, that Adler Corporation was availed of during each of the years 1952 and 1954, and American Corporation was availed of during each of the years 1952, 1953, and 1954, for the purpose of preventing the imposition of the surtax, or "income tax," upon their respective shareholders by permitting earnings or profits to accumulate beyond the reasonable needs of the business instead of being divided or distributed, within the meaning of section 102 of the Internal Revenue Code of 1939 and sections 531–537 of the

Internal Revenue Code of 1954. However, Adler Corporation was not so availed of during the year 1953.

With respect to the year 1953, the balance sheet of Adler Corporation reveals that the total of its surplus and surplus reserves as of the end of the year 1953 ($657,934.74) was less than the total amount of its surplus and surplus reserves as of the end of the preceding year ($658,398.66) and, accordingly, that there was no accumulation of "earnings or profits" by Adler Corporation during that year. This fact has not been called to our attention or discussed by either of the parties. It cannot, however, be ignored. As our findings indicate, this situation apparently resulted from the payment of an "Additional Federal tax" which, though nondeductible in determining the "section 102 net income" upon the basis of which the surtax would otherwise be computed (section 102(d)(1)(A)),[3] is nevertheless to be considered in determining whether the corporation was "availed of for the purpose of preventing the imposition of the surtax upon its shareholders * * * through the medium of permitting earnings or profits to accumulate instead of being divided or distributed." As was stated in *W. S. Farish & Co.*, 38 B.T.A. 150, 158, affd. 104 F. 2d 833, "taxable net income is purely a statutory concept, and bears no necessary relation to gains and profits subject to distribution as dividends. * * * The proscribed act is the accumulation of 'gains and profits' and not 'net income' or 'taxable net income.'" Each year is to be considered separately, *W. S. Farish & Co.*, *supra;* *Corporate Investment Co.*, 40 B.T.A. 1156, 1171. Under the circumstances presented herein, section 102 is not applicable to the Adler Corporation for the year 1953.

The second issue concerns the deductibility under sections 23(a)(1)(A), I.R.C. 1939, and 162(a)(3), I.R.C. 1954, of rental payments made by each of the petitioner corporations to Jack Adler during the years 1952, 1953, and 1954. During each of these years Adler Corporation paid $20,000 and American Corporation paid $8,000. These rentals were computed on the basis of 40 cents per square foot per year. Respondent determined that the fair rental value during the years in question was only 20 cents per square foot per year and therefore determined that rental payments in excess of $10,000 per year by Adler Corporation and $4,000 per year by American Corporation were not required as a condition to the continued use or possession of the leased property.

---

[3] SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS.
(d) DEFINITIONS.—As used in this chapter—
(1) SECTION 102 NET INCOME.—The term "section 102 net income" means the net income, * * * minus the sum of—
(A) TAXES.—Federal income, war-profits, and excess-profits taxes * * * paid or accrued during the taxable year, * * * but not including the tax imposed by this section * * *

Section 23(a)(1)(A), which is substantially the same as section 162(a)(3) of the 1954 Code, provides that:

In computing net income there shall be allowed as deductions:

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business &ast; &ast; &ast;; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. &ast; &ast; &ast;

The Codes do not specifically limit deductions for rent to "a reasonable allowance" as in the case of salary or compensation. *Stanley Imerman*, 7 T.C. 1030. The primary consideration as to the deductibility of payments claimed as rental expenses is whether they were in fact rent. To the extent they were not, such payments would not be ordinary and necessary and therefore would not be deductible as rental expenses. *Southern Ford Tractor Corporation*, 29 T.C. 833.

In *Roland P. Place*, 17 T.C. 199, 203, affd. 199 F. 2d 373, certiorari denied 344 U.S. 927, the general rule was stated to be as follows:

The basic question is not whether these sums claimed as a rental deduction were reasonable in amount but rather whether they were in fact rent instead of something else paid under the guise of rent. The inquiry is whether the petitioner was in fact and at law "required" to pay these sums as rent. See section 23(a)(1)(A) of the Internal Revenue Code. When there is a close relationship between lessor and lessee and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger. *Manos* v. *Commissioner* 187 F. 2d 734; *Stanwick's, Inc.*, 15 T.C. 556, affd. (C.A. 4), June 25, 1951; *Limerick's, Inc.*, 7 T.C. 1129, affd. 165 F. 2d 483; *Hightower* v. *Commissioner*, 187 F. 2d 535. See *Commissioner* v. *Lincoln Electric Co.*, 176 F. 2d 815.

The close relationship between the lessor and the lessee in the instant case is evident. Jack Adler was not only lessor, but he was the principal stockholder and president of both lessee corporations. Petitioners do not contend there was arm's-length bargaining. They do contend, however, that the 40 cents per square foot per year which was paid for the use and possession of the property in question during the years 1952, 1953, and 1954, was a reasonable rental.

The petitioners introduced the testimony of two witnesses, both experts in the real estate business in St. Louis for many years. Both witnesses had examined the premises in question and were familiar with the surrounding area. Both witnesses expressed the opinion that the reasonable rental value during the years in issue was approximately 40 cents per square foot per year.

The respondent did not offer the testimony of any expert witnesses of his own. Consequently the testimony of petitioners' witnesses

stands uncontradicted and overcomes the presumptive correctness of respondent's determination. The fact that petitioners paid a lesser rent to Jack Adler under an earlier lease is not controlling. On the basis of the evidence presented, we hold that the payments of 40 cents per square foot per year during the years in issue were reasonable and not in excess of what petitioners would have been required to pay had they been dealing with a stranger at arm's length. Accordingly such payments constituted rent which petitioners were required to pay for the continued use and possession of the property in question, for purposes of their trade or business, and are therefore deductible.

*Decisions will be entered under Rule 50.*