Ryegate Paper Company v. Commissioner.
Ryegate Paper Co. v. Commissioner
Docket No. 81991.
United States Tax Court
T.C. Memo 1961-193; 1961 Tax Ct. Memo LEXIS 148; 20 T.C.M. (CCH) 964; T.C.M. (RIA) 61193; June 30, 1961
George E. Cleary, Esq., 52 Wall St., New York, N. Y., and A. Pearley Feen, Esq., for the petitioner. Raymond T. Mahon, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: The respondent determined deficiencies in petitioner's income tax for the years 1951 and 1952 in the amounts of $105,756.01 and $11,933.22, respectively. The only issue for decision is the correctness of respondent's determination that of the amounts claimed by petitioner as deductions for rental expenses, $117,325.10 for the year 1951 and $148,576.50 for the year 1952, did not represent ordinary and necessary business expenses which were properly deductible. Findings of Fact Petitioner, a New Hampshire corporation with its principal office at East Ryegate, Vermont, filed its income and excess profits tax returns *149 for the years 1951 and 1952 with the district director of internal revenue for the district of Vermont. Petitioner kept its books and records and filed its tax returns on an accrual basis of accounting and on the basis of the calendar year. In 1950 petitioner had outstanding 5,000 shares of common stock and was engaged in the manufacture of paper and paper products with plants and machinery located in both Vermont and New Hampshire. On February 23, 1951, Max D. Bliss became president and director of petitioner; Fred W. Vogel became treasurer and director; Pearl Bliss, the wife of Max D. Bliss, became vice president and director; and Maude M. Vogel, the wife of Fred W. Vogel, became a director. These individuals continued in these positions with petitioner throughout all times here pertinent. Prior to 1951 and at all times material hereto thereafter Bliss and Vogel and their wives were the sole stockholders and directors of two other corporations, Green Mountain Tissue Co., Inc. (hereinafter called Green Mountain) and White Mountain Paper Co., Inc. (hereinafter called White Mountain), which were manufacturing companies actively engaged in the paper and paper products business in New *150 England. Bliss and Vogel also controlled and managed a plant in Worcester, Massachusetts, engaged in the paper business, Mountain Waterproof Paper, Inc. Prior to 1951 the operations of all three of these corporations had been successful. Vogel had technical chemical training and had been engaged in the paper manufacturing business since 1924. Bliss had been connected with the paper manufacturing business since January 1, 1946. Sometime in 1950 Vogel answered an advertisement in a trade journal and found that the stock of Ryegate Paper Company, petitioner herein, was for sale. The asking price of the stock was $1,200,000. Bliss and Vogel did not purchase the stock at that time. Some months later Vogel received a call from the president of the company which then owned the stock of petitioner suggesting that negotiations be resumed with respect to the stock. Vogel and Bliss investigated the business of petitioner and decided they were interested in acquiring the mill but they were unable to raise the necessary money to purchase the stock. At the suggestion of their bank they contacted G. H. Walker & Co., an investment banking house in Providence, Rhode Island and were informed *151 that the Rhode Island Charities Trust might agree to acquire the physical property then owned by petitioner and lease it back to petitioner. At that time the trustees of the Rhode Island Charities Trust were Godfrey B. Simonds, Benjamin R. Sturges and Joseph W. Ress (hereinafter referred to as the trustees). Neither Bliss nor Vogel had previously had any contact or been acquainted with any one of these trustees. After negotiations, the trustees agreed with Bliss and Vogel to negotiate for the purchase on behalf of Rhode Island Charities Trust of petitioner's stock with the understanding that if the negotiations were successful, the trustees would purchase the stock, take all of the fixed assets of petitioner, except inventory, automobiles and trucks, as a dividend, and then sell the stock to Green Mountain and White Mountain with the agreement that petitioner would lease the fixed assets from the trustees. These negotiations culminated in a contract between the trustees and the then owners of petitioner's stock whereby the trustees were to buy all of the stock for $1,075,000 and a contract between Vogel and Bliss and the trustees whereby Vogel and Bliss or their nominees would purchase *152 the stock from the trustees for $375,000 after all of the fixed assets, except inventory, automobiles and trucks, had been declared to the trustees as a dividend and petitioner would lease from the trustees the fixed assets under terms which were stated in the contract. Bliss and Vogel negotiated the best terms for a lease to petitioner of the physical assets to which the trustees were willing to agree. Both the contract between the trustees and the then owners of petitioner's stock and the contract between Bliss and Vogel and the trustees were dated January 15, 1951. The agreements contained in these two contracts were carried out on February 23, 1951. On that date the trustees purchased all of the stock of petitioner for $1,075,000, declared a dividend of all the fixed assets with the exceptions heretofore noted, and after the declaration of the dividend sold one-half the stock of petitioner to Green Mountain for $187,500 and one-half to White Mountain for the same price. A lease was executed whereby petitioner leased from the trustees under the terms agreed upon in the January 15, 1951 contract the fixed assets which had been declared as a dividend to them. The lease was for a *153 term of 20 years, but the lessee if not in default had the right to terminate the lease on giving 6 months' prior notice at the end of 8, 12, or 16 years. The agreed rental was $250,000 for the year March 1, 1951 to February 29, 1952, and $225,000 per year for each of the next 3 years payable monthly at the end of each month. Thereafter, the rent was 5 percent of petitioner's net sales with a minimum rental of $50,000 per year, payable monthly 10 days after the close of each month. At the time the lease agreement was being negotiated both the trustees and Bliss and Vogel were of the opinion that petitioner's sales could be increased under the management of Bliss and Vogel to an amount that would result in 5 percent thereof approximating the previous fixed rental. Petitioner's actual sales for the years 1951 through 1956 were as follows: 1951
$2,162,354.79
1952
1,611,803.06
1953
1,136,435.46
1954
1,928,398.02
1955
2,223,739.85
1956
2,869,448.49
The lessee agreed to deposit $350,000 in escrow at various prescribed times as security for performance of its obligation under the lease. The lease provided that the lessee was to pay all taxes and assessments against *154 the leased premises, keep the property insured, and keep the buildings, machinery, and other improvements in good repair. In case of default in payment of rent or other default the lessor had the right to re-enter and repossess the property after giving 30 days' written notice if the default was not cured. The lease contained no provisions giving the lessee any option to purchase the property subject to the lease at anytime. In accordance with the provisions of the lease that the lessee make a deposit in escrow, petitioner on February 23, 1951, deposited $175,000 with the Providence Union National Bank and Trust Company at Providence, Rhode Island. This $175,000 was obtained by petitioner as loans from Green Mountain and White Mountain. Later in 1951, petitioner deposited an additional $25,000 in the escrow fund making a total deposit in this fund of $200,000. No further deposits were made by petitioner to this escrow account, and this account remained at $200,000 until December 1, 1953. Petitioner entered into possession of the leased property on February 23, 1951, and operated it throughout the years 1951, 1952, and 1953. The rent for this property according to the terms of the *155 lease for the balance of the year 1951, amounted to $208,333.30, and the rent for the year 1952, amounted to $229,166.66. Petitioner accrued these amounts as rental expenses on its books and currently paid these amounts to the trustees throughout the years 1951 and 1952. For the year 1951 after payment of the rent of $208,333.30, the petitioner's net income was $82,739.41 and for 1952 after payment of the rental of $229,166.66 petitioner sustained a net loss of $90,822.91. Petitioner's books at December 31, 1952, showed a book net worth of $263,136.20, including in its assets the $200,000 deposited in escrow. In January 1953 petitioner could not continue to make the rental payments called for by the lease without jeopardizing its working capital. Petitioner made no further payments under this lease after the payment made for December 1952 but it continued to accrue rental expense on its books thereafter. On a number of occasions between January 1953 and August 1953, Vogel and Bliss discussed with the trustees petitioner's problems causing its default in its rental payments. The trustees did not exercise the right provided by the lease to re-enter and repossess the property nor *156 did they take any steps to collect the 1953 rent out of the escrow fund. Between January 1953 and August 1953 Vogel and Bliss discussed with the trustees the possible purchase of the leased property by petitioner. At a meeting of petitioner's stockholders on June 17, 1953, petitioner's officers were authorized to negotiate for the purchase of the leased property. Early in August 1953 an oral agreement was reached between the trustees and Vogel and Bliss representing petitioner that petitioner would purchase the property which was subject to the lease from the trustees for $687,500, payment to be made of $287,500 in cash, the $200,000 in the escrow fund, and $200,000 in 5 percent 10-year installment notes secured by a second mortgage. Because of petitioner's difficulty in arranging financing for the proposed purchase, the oral agreement was not reduced to writing until December 1, 1953. On December 1, 1953, the trustees transferred to petitioner all the real estate, machinery, equipment, and other property which had been subject to the lease for a price of $687,500 payable in accordance with the oral agreement. Any obligation of petitioner to pay rent for the year 1953 was cancelled. *157 Petitioner financed its purchase of the assets previously rented with $200,000 borrowed from the Indian Head National Bank of Nashua secured by real and personal property mortgages on the fixed assets and a life insurance policy on the life of Vogel, and money raised by issuing 4 percent preferred stock to Green Mountain and White Mountain for their notes in the total amount of $175,000, previously borrowed by petitioner to place in the escrow fund and for additional cash. In his notice of deficiency respondent disallowed $117,325.10 of the total rental expense of $208,333.30 claimed by petitioner in 1951 and disallowed $148,576.50 of the total rental expense of $229,166.66 claimed by petitioner in 1952 with the explanation that these amounts did not constitute an allowable ordinary trade or business expense deduction for the respective taxable years under the provisions of section 23 of the Internal Revenue Code of 1939. Some of the facts have been stipulated and are found accordingly. Opinion Section 23 of the Internal Revenue Code of 1939[1] does not limit rental payments to a reasonable allowance but provides for the deduction of rental or other payments required to be *158 made as a condition to the continued use or possession for the purposes of the trade or business of property to which a taxpayer has not taken or is not taking title and in which he has no equity. However, in situations where amounts paid under leases as rentals are in fact or substance something other than rent, so that the facts do not support a conclusion that the amounts were required to be paid as a condition to the continued use or possession of the property for the purposes of the business, such deductions are not allowable as business expenses. Southern Ford Tractor Corporation, 29 T.C. 833, 842 (1958) and cases therein cited, and Potter Electric Signal & Mfg. Co. 286 F. 2d 200 (C.A. 8, 1961), affirming a Memorandum Opinion of this Court and cases therein cited. *159 Therefore, the first question to be determined is whether the payments made by petitioner in 1951 and 1952 were in substance as well as in form rental payments required to be made by petitioner as a condition to the continued use or possession of the property used in its trade or business. Under the terms of the lease they were such, but respondent contends that no business purpose was served to petitioner by this agreement under which it paid to the trustees a rental which would return to them in 3 years their total cost of the properties. Respondent contends that the agreement of petitioner to this lease was merely a device to enable Vogel and Bliss to acquire for their own benefit the stock of petitioner. Petitioner does not deny that the arrangement made with the trustees was to enable Bliss and Vogel to acquire petitioner's stock for the corporations which they controlled but contends that irrespective of this fact the rentals were ordinary and necessary business expenses of petitioner. Petitioner points out that all of the transactions between Bliss and Vogel and the trustees were arm's-length transactions, that the agreement to have petitioner, when Bliss and Vogel acquired *160 control thereof, enter into this lease was necessary to enable Bliss and Vogel to acquire for their wholly owned corporations petitioner's stock, and that petitioner as it existed when Bliss and Vogel acquired control could not have conducted its business without leasing the fixed assets from the trustees. The evidence clearly shows that the transactions between Bliss and Vogel and the trustees were all arm's-length and that the trustees as a condition to entering into the transaction to acquire petitioner's stock and sell it to the corporations controlled by Bliss and Vogel required of them an agreement to have petitioner lease the property which the trustees would declare to themselves as a dividend. Petitioner, as constituted after the declaration of its fixed assets as a dividend to the trustees, had a business purpose for entering into the lease since it could not have operated without the leased assets. Also, the trustees had a business purpose in demanding that the fixed assets be transferred to them and leased back at the stipulated rental if they agreed to enter the transaction at all. The trustees were not interested in the operation of a paper mill but were interested *161 in making income through investment in fixed assets. The only business purpose that petitioner had in declaring its fixed assets as a dividend to the trustees was to benefit its then stockholders by enabling them to consummate the entire transaction previously agreed upon between them and Bliss and Vogel. Dividends declared by a corporation are expected to be for the benefit of its stockholders. There is nothing unusual for a part of the cash or other property of a corporation to be declared as a dividend to the current stockholders prior to the sale of all the corporate stock to others. The new stockholders acquire the stock of the corporation as then constituted and the necessity for the corporate actions from that moment forward must be considered in the light of its assets as so reduced. After the sale of petitioner's stock by the trustees to White Mountain and Green Mountain there was no relationship between the trustees and petitioner other than that of lessor and lessee. The amount of rental to be paid by petitioner was arrived at in an arm's-length transaction, the negotiations being conducted prior to the time that the trustees became stockholders of petitioner. The rental *162 was required to be paid by petitioner as a condition to its continued use or possession of the property covered by the lease and the leased property was needed for the purposes of its trade or business. It is clear from the lease that petitioner had not taken and was not taking title to the property and had no equity therein in 1951 or 1952, and we have so found. The rentals paid fall clearly within the deduction allowed by section 23(a)(1)(A) of the Internal Revenue Code of 1939. Respondent offered the testimony of an expert witness to the effect that a reasonable rental for the properties leased by petitioner in 1951 and 1952 was $116,250 and $111,625, respectively. He contends that this evidence must be accepted since petitioner offered no evidence of a reasonable rental value of the property, citing American Metal Products Corporation, 34 T.C. 89 (1960), affd. 287 F. 2d 860 (C.A. 8, 1960). We have made no finding respecting a reasonable rental value of the property leased by petitioner since in our view such a finding would be immaterial unless there were some necessity for determining therefrom whether the rental paid was required as a condition to *163 the continued use of the property in petitioner's trade or business. The evidence is unequivocal that the rental paid by petitioner was the lowest Bliss and Vogel who were to become the indirect owners of all its stock and its chief officers were able to negotiate in an arm's-length transaction with parties whose interest was adverse to theirs. From this evidence we have concluded that the rental payments were required in 1951 and 1952 as a condition to the continued use of the property by petitioner in its business. The fact that petitioner may have made a bad bargain does not cause the payments to be in fact or in character something other than rent, nor does the fact that petitioner was able to negotiate other terms for the use of the property in 1953 and subsequent years when its financial condition had changed, justify a conclusion that it could have continued in possession of the property in 1951 and 1952 without paying the rental therefor required by its lease. The lease unequivocally placed upon the petitioner the requirement to pay the agreed rental for the continued use of the property and this petitioner did in the years 1951 and 1952. In the alternative respondent argues *164 that if these payments were rental payments, they were advance rentals which should be amortized over the life of the lease. The record shows the contrary. Under the terms of the lease a fixed rental was to be paid for the first 4 years and thereafter an amount equal to 5 percent of sales, with an annual minimum of $50,000. The evidence shows that after investigation of the operations of petitioner both the trustees and Bliss and Vogel anticipated that when the operation of petitioner's business was under the management of Bliss and Vogel its sales would be increased to such an amount that 5 percent thereof would approach the amount of the previously set annual rental. Even if the rental after the first 4 years was to be somewhat less than for the previous years, there would be no inference that the earlier payments were advance rentals, where as here the lessee was to keep the building and machinery in repair and it would be logical to assume that machinery after 4 years further use would require more repairs. Under the terms of the lease the rental payments to be paid for 1951 and 1952 were for the use of the property in the year for which the payments were made. We hold that petitioner *165 is entitled to deductions as ordinary and necessary expenses for rental payments in the years 1951 and 1952 in the amounts of $208,333.30 and $229,166.66, respectively. Because of the agreement of the parties with respect to the net operating loss issue, Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. (a)(1)(A) In general. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. * * *↩