STARKS BUILDING CO., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Starks Bldg. Co. v. Commissioner
Docket No. 7189-71.
United States Tax Court
T.C. Memo 1973-256; 1973 Tax Ct. Memo LEXIS 28; 32 T.C.M. (CCH) 1201; T.C.M. (RIA) 73256; November 26, 1973, Filed Henry R. Heyburn and William C. Stone, for the petitioner. Frederick W. Krieg, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACTS AND OPINION 2 SCOTT, Judge: Respondent determined deficiencies in petitioner's income taxes for the taxable years 1966 and 1967 in the amounts of $132,548.63 and $147,492.61, respectively. Some of the issues raised by the pleadings have been disposed of by agreement of the parties. The only issue remaining for decision is whether, for each of the years in issue, petitioner was formed or availed of for the purpose of avoiding income taxes with respect to its shareholders by permitting earnings and profits to accumulate instead of being *30 divided or distributed, and is thus subject to the accumulated earnings tax imposed by section 531, I.R.C. 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Starks Building Co. was incorporated pursuant to the laws of the Commonwealth of Kentucky in 1901. It has been in the office building business in Louisville, Kentucky continuously since 1913. Petitioner's principal place of business at the time the petition in this case was filed was Louisville, Kentucky. Petitioner keeps its books and records on an accrual method of accounting and files its returns for 3 calendar years. It filed its Federal corporate income tax returns for the calendar years 1966 and 1967 with the district director of internal revenue, Louisville, Kentucky. Petitioner's principal source of income throughout its existence has been from the operation of an office building known as the Stark Building, located on the northeast corner of Fourth and Walnut Streets in downtown Louisville, Kentucky. During the years at issue, Franklin F. Starks, Jr., was *31 the president of petitioner and his father, Franklin F. Starks, Sr., was chairman of the board of directors of petitioner. Petitioner's secretary-treasurer was Eathel Judd. Throughout the years at issue company policy was set by a 7-man board of directors which met every month and which consisted of: Franklin F. Starks, Sr., Franklin F. Starks, Jr., Joe B. Rodes, J. C. Rodes, John S. Rodes, Henry R. Heyburn, and Henry Y. Offutt. Of these directors, Franklin F. Starks, Sr., Joe B. Rodes, and John S. Rodes were shareholders of petitioner. Petitioner's capital stock is divided into 2,500 shares. During the years at issue 34-3/5 shares were retained by petitioner. A trust known as the Rodes Trust owned 1,002 shares of petitioner for the benefit of the following persons in the amounts indicated during the years in issue: 4 Number of Shares
Beneficial owner
1966
1967
John S. Rodes
186
186
Joe B. Rodes
166
166
Estate of Clifton Rodes
186
-
Helen Hickman Rodes
-
7
Stannye Rodes Ruetlinger
-
179
Susan R. Embry
171
171
Winnifred S. Reynolds
12-1/2
12-1/2
Daniel M. Starks
12-1/2
12-1/2
Effie Starks Weller
12-1/2
12-1/2
Richard S. Starks
12-1/2
12-1/2
Farmers National Bank,
183
183
Trustee u/w J. Waller Rodes
John Burgin, Jr.
60
60
*32 During and subsequent to the years here in issue the trustees of the Rodes Trust were Franklin F. Starks, Sr., J. C. Rodes, and The Kentucky Trust Co. The Rodes Trust was created on April 5, 1922, and it gave to the trustees of the trust the power to vote the shares of petitioner. All dividends which petitioner would pay to the trust would be, by the terms of the governing instrument, promptly paid to the beneficiaries of the trust in proportion to the number of shares held for each of the beneficiaries by the trustees. A trust known as the Starks Trust owned 1,110-1/2 shares of petitioner for the benefit of the following persons in the years in issue: 5 Number of Shares
Beneficial owner
1966
1967
Cornelia G. Kelley
240
240
Estate of John P. Starks
518
518
Louisa S. Allen
165
165
Lucy B. Holt
42-1/2
42-1/2
Sophia B. Moore
85
85
Florence B. Bailey
60
60
During and subsequent to the years at issue the trustees of the Starks Trust were Franklin F. Starks, Sr., J. C. Rodes, and The Kentucky Trust Co. The Starks Trust was created on January 20, 1917. The governing instrument provides that the trustees of the Starks Trust shall *33 have the full power to vote the stock it holds of petitioner. The outstanding shares of petitioner which were not held in either the Rodes Trust or the Starks Trust were held during the years in issue by the following persons in the amounts indicated: Number of shares
Beneficial owner
1966
1967
Franklin F. Starks, Sr.
236
236
Louisa S. Allen
24
24
Farmers National Bank,
3
3
Trustee u/w J. Waller
Rodes
W. Preston Burgin
5-3/5
5-3/5
Trustee
Joe B. Rodes
8-1/2
8-1/2
John S. Rodes
8-1/2
8-1/2
Elizabeth E. Smith
13-1/2
13-1/2
Georgia Hart Rodes
8-1/2
8-1/2
Preston Burgin, Jr.
5-3/5
5-3/5
Sophia Burgin McHargue
5-3/5
5-3/5
Kentrua & Co.
20
20
Martha Burgin Linville
5-3/5
5-3/5
Kentucky Trust Co.,
8-1/2
8-1/2
Trustee u/w Helen
Hickman Rodes 6 The trustees of the Starks Trust were empowered to determine what portion of the dividends received from petitioner should be paid to the following beneficiaries: Beneficiary [1]
Number of shares
Cornelia Guthrie Jones Kelley
240
Lucy B. Holt
42-1/2
Mary Holt
42-1/2
Sophia B. Moore
85
Preston Burgin
75
Anna Sallee
70
John Burgin
60
Florence B. Bailey
60
*34 The trustees were also empowered to distribute the shares of petitioner to the beneficiaries after each reached the age of 21 years. The trustees of both the Rodes Trust and the Starks Trust consist of a "Starks," Franklin F. Starks, Sr., a "Rodes," J. C. Rodes, and a "neutral," The Kentucky Trust Co., this arrangement having been early established by custom and actual agreement. The Kentucky Trust Co. was represented during the years in issue by Henry F. Offutt, who was also a member of petitioner's board of directors. The trustees of both the Rodes Trust and the Starks Trust have the power to sell petitioner's shares. The Starks family was represented on petitioner's board of directors by Franklin F. Starks, Sr., Franklin F. Starks, Jr., and Henry R. Heyburn. The Rodes family 7 was represented by Joe B. Rodes, J. C. Rodes, and John S. Rodes. Henry Y. Offutt, formerly chief executive officer of the First National Bank-Kentucky Trust Co. served as a "neutral" director. The Starks, Sr. and Jr., had served on the board of directors of the latter *35 institution. All of the beneficial owners of petitioner's stock were members of or related in some way to one or both of the Starks and Rodes families. Day-to-day management of petitioner was in the hands of its president, Franklin F. Starks, Jr., who was paid a salary of $28,150 in 1966 and $30,025 in 1967. His father, Franklin F. Starks, Sr., was chairman of the board of directors and had retired from any active management of the company at the end of 1965 at which time his salary was $29,500. During each year in issue Franklin F. Starks, Sr., spent approximately 7 months in Florida and received a pension from petitioner of $18,000 per year. Aside from its president, the staff of petitioner consisted of a building superintendent, a secretary, two bookkeepers, and 70 service employees. In 1913, the first section of the Starks Building was opened at the northeast corner of Fourth and Walnut Streets, and in 1926 the Starks Building as it now stands was completed by the erection of an addition to the east 8 of the original construction on Walnut Street. The lot upon which the building sits measures 229 feet by 160 feet. The gross area of the building is approximately 450,000 *36 square feet and the rentable area 300,000 square feet. The total investment in the building itself as of December 31, 1967, was $2,502,971 and the investment in the internal equipment such as elevators, heating and air conditioning was $2,510,440 or a total investment of $5,013,411, or approximately $16.71 per square foot of net rentable area and $11.14 per square foot of gross area. The Starks Building was well maintained and was the prestige office building in Louisville prior to and during the years in issue. In the period 1955 to 1967 extensive improvements were installed which may be summarized as follows: Central air conditioning
$1,288,511
Elevator automation
342,000
Modernization of arcade
10,000
Boilers
98,733
Air conditioning coils
29,321
Roof
8,500
Total
$1,777,065
The boilers and air conditioning coils were installed in the Starks Building during the years 1966 and 1967. Petitioner estimated the boilers to have a useful life of 25 years and the air conditioning coils to have a useful life of 20 years. No amounts were shown on petitioner's 9 records as owing on either December 31, 1966 or December 31, 1967, on account of these improvements *37 to the Starks Building. The Starks Building has several long-term tenants. Rodes, Rapier and Co., a first floor men's clothing store, executed a 25-year lease in 1969. Standard Oil Co. of Kentucky occupied two full floors under a 25-year lease which had been in effect for some years prior to the years here in issue.During the years here in issue the Colonade Cafeteria in the basement was under a 10-year lease and Liberty National Bank under a 25-year lease, both of which had been entered into prior to the years here in issue. Most of the other tenants in the building had leases of 1 to 3 years but some were under leases for 8 years. Following the completion of the addition to the Starks Building in 1926, a period of almost 20 years elapsed before the rentals received from the Starks Building provided what its owners considered to be an adequate return on their investment. During 4 years in the 1930's no dividend was paid by petitioner to its shareholders. It was generally considered that Louisville had excessive rental office space during the 1920's and 1930's. 10 In 1948 the board of directors of petitioner established a Capital Items Reserve Fund which was an agency *38 account with The Kentucky Trust Co. as agent. The agency agreement provides in part that petitioner can withdraw at any time from the agent securities or cash. All registered securities held in this agency account were carried in the name of petitioner. The securities in this account were bought and sold in accordance with the decision of The Kentucky Trust Co. as approved and assisted by petitioner's investment committee. This investment committee was appointed by petitioner's board of directors and consisted of two directors and one partner in a local brokerage firm. Prior to, during, and subsequent to the years at issue, the amount transferred to the Capital Items Reserve Fund for each year exactly equaled the amount deducted by petitioner on its Federal income tax return for the previous year as depreciation and amortization of improvements. In 1953, $250,000 was withdrawn from the Capital Items Reserve Fund when petitioner built the Starks Parking Center. In 1954, $189,191.75 was withdrawn for air conditioning and modernization of the elevators. In 1969, $340,243.23 was withdrawn to pay for a Starks Parking Center garage addition. 11 During the years in issue *39 petitioner operated a parking garage known as the Starks Parking Center in conjunction with the office building. The construction of the parking garage commenced in 1953 with petitioner's acquisition of a lot measuring 177 feet by 200 feet on Third Street in Louisville and the initial lease of an adjoining lot to the north, 80 feet by 200 feet. The adjoining lot was purchased in early 1968 for $135,000 plus certain parking concessions extended to the seller of the lot. The garage was again enlarged in 1969 at a cost of approximately $340,000. The entire cost of the 1969 construction of the garage addition was withdrawn from the Capital Items Reserve Fund. The corner of Fourth and Walnut where the Starks Building is located had traditionally been referred to as the "100 percent corner" by persons in Louisville engaged in the real estate business. However, in the mid-1960's there was a substantial movement 3 blocks south to Broadway where the Portland Federal and the Bank of Louisville buildings were constructed. There was also a movement to the Riverfront Project, located 4 blocks north of the Starks Building. During this same period, three of the four principal banks in Louisville *40 began making plans to erect or participate in the erection of new skyscraper office buildings to house their banking facilities. 12 At a monthly meeting of petitioner's board of directors held on June 26, 1963, Franklin F. Starks, Sr., stated that the time was approaching that the demand for modern office space in Louisville would justify the erection of a new office building. He further stated: If this Company is to remain in the office building business, it is necessary for it to face this situation and be in a position to finance a new structure which might require an investment within the range of $9,000,000 to $12,000,000. The purpose of the Capital Items Reserve Fund presently having a value of approximately two and a quarter million dollars is to put this Company in a position to finance such a project. The officers of petitioner were instructed by the board of directors to discuss with the Citizens Fidelity Bank and Trust Co. (hereinafter Citizens), one of the leading Louisville banks, the possibility of that bank's becoming a key tenant for such a new building to be built by petitioner. The board anticipated that Citizens would plan on moving to new quarters *41 in 1970. Following up on these instructions by the board, on June 28, 1963, Franklin F. Starks, Sr., wrote George E. Egger, then a director of Citizens and chairman of its building planning committee, inviting the latter to discuss Citizens' being the key lessee in a new building to be built by petitioner. 13 The following day, June 29, 1963, the Starks, Sr. and Jr., traveled to New York City where they discussed with the vice president in charge of city mortgages of Equitable Life Assurance Society (Equitable) the possibility of obtaining financing for the proposed new building with a major bank as the key tenant. Petitioner's officers were assured that Equitable was interested in making such a loan. The Starks also discussed their plans with Jack Cushman of Cushman-Wakefield, Inc., a major real estate firm in New York City. In July 1963 the Starks employed Maynard Hokanson of Indianapolis to develop detailed terms for a proposed lease of space to Citizens in a new building. Hokanson submitted a 4-page single-spaced report with four exhibits on August 5, 1963. The Starks also examined a new bank building in Indianapolis. Negotiations between petitioner and Citizens *42 continued over the next several years. The chairman of Citizens' building committee made it clear to every building developer with whom discussions were held concerning the proposed Citizens Bank Building that the building would have to be built in accordance with the specifications set forth by the bank. By 1966 Citizens had decided to build a bank and office building with approximately 600,000 square feet 14 of office space which was twice the size of the building originally conceived. This decision was at least in part influenced by the rapid growth of Citizens both in deposits and employees. At this time Citizens finally completed the purchase of the individual lots comprising the block upon which its new building was to be erected. Under the scheme proposed by Hokanson and required by the bank, petitioner would purchase the land upon which the new building would be erected. Citizens paid more than $2-1/2 million for the lots upon which it planned to have its new building erected. By March of 1966 petitioner was aware that Citizens intended to utilize the services of an outside developer to build its new building. The new Citizens Building was developed by a Seattle *43 company shortly after 1967 and is a 30-story office building costing over $20 million. Petitioner's officers contacted the building committee personnel at Citizens three or four times during the years 1965 and 1966. By December 31, 1966, and December 31, 1967, petitioner had not obtained financial backing for the erection of an office building other than the assurances expressed by Equitable in 1963. In August 1963, Franklin F. Starks, Jr., contacted Harry K. Moore, a realtor specializing in industrial and 15 commercial properties and discussed petitioner's desire to obtain the properties located immediately to the east of the Starks Building. A Lane Bryant store was situated on one of the adjoining lots and the owner of this lot, DuRand, refused to dispose of his property unless he could receive in exchange "like-kind" investment property in order to avoid Federal income tax on the transaction. DuRand's property was assessed at $168,000. A suitable "like-kind" building was found in 1965, and in February 1966 an engineering firm submitted an estimate that $203,000 would have to be expended to put this "like-kind" building in rentable condition. This estimate coupled *44 with the $250,000 anticipated cost of the unimproved building discouraged petitioner from immediately pursuing its plan to acquire DuRand's lot. In August 1965, negotiations were begun by petitioner's officers to acquire the property immediately north of the Starks Parking Center. This land, known as the Kaufman property, was purchased by petitioner in January 1968 for $135,000. An addition to the Starks Parking Center was constructed on the Kaufman property in 1969 at a cost of approximately $340,000. In the late summer or fall of 1965 petitioner's board of directors considered the purchase of a lot located on the southwest corner of Third and Walnut Streets. This 16 lot, known as the Broida property, measured 89.5 feet by 150 feet and the sales price was $350,000. Petitioner considered the lot too small and not suitable for an office building and it rejected the offer. In October 1965 Franklin F. Starks, Jr., learned that the Francis Building, an older Louisville building located to the south of the Starks Building, was to be sold at a foreclosure sale. Starks, Jr., retained the services of Maynard Hokanson to inspect the building and advise petitioner whether to *45 purchase the building. Hokanson's report was unfavorable and petitioner did not bid for the building. The Francis Building was sold in February 1966. On November 24, 1965, petitioner's president notified its board of directors that petitioner might have an opportunity to purchase the property located on the southeast corner of Third and Walnut Streets, usually referred to as the McDowell Building. This is an office building with retail stores on the first floor. It has a net rentable area of approximately 48,000 square feet. The purchase price would be $400,000. The board expressed the opinion that petitioner would benefit from the acquisition of the McDowell Building by having additional office space in inventory for the needs of the present tenants of the Starks Building and petitioner would benefit from the 17 preservation of a prominent men's club located in the McDowell Building. On January 21, 1966, petitioner's board of directors authorized the purchase of the McDowell Building for $400,000, $100,000 of which was to come from cash on hand and the balance to be borrowed on a demand note secured by the funds in the Capital Items Reserve Fund. Petitioner paid approximately *46 $125,000 in cash and executed a demand note in the amount of $275,000 payable to the First National Bank for the McDowell Building. The amount of the demand note is reflected as a current liability on petitioner's December 31, 1966 and December 31, 1967 financial statements and income tax returns. The McDowell Building land extended 138 feet eastwardly from the southeast corner of Third and Walnut Streets and 136 feet southwardly from that corner with the exception of a parcel measuring 63 feet on Third Street with a depth of 55 feet in the southwest corner of the McDowell lot. This latter lot was owned by Fenley Realty. Petitioner's board of directors considered that this lost would be a desirable acquisition for petitioner in that it would square-out the McDowell property. Petitioner's board on January 21, 1966, authorized the purchase of the Fenley property for an amount not to exceed $55,000. 18 The McDowell property was conveyed to petitioner in March 1966. It was at least partially rented at the time petitioner acquired it and petitioner has continued to lease out space in it up to the present time. Petitioner did not immediately intend to demolish the McDowell *47 Building. Petitioner estimated that when it acquired the McDowell Building its useful economic life for depreciation purposes was 15 years. Accompanying the McDowell property were plans for a new office building to be constructed on that site (but not including the Fenley property) and a leasing survey and marketing study dated September 1965. This survey revealed that a large number of petitioner's major tenants, including several insurance companies, would strongly consider terminating their leases in the Starks Building and moving to more modern facilities. The opinion was also expressed in the report that A number of financial base tenant prospects were canvassed, but the majority of the larger institutions already have branch facilities in the immediate vicinity - almost all on 4th Street. We do feel strongly however, that once the building is underway, some type of financial tenant, possibly a brokerage firm or savings and loan association will be obtained. In April 1966 Franklin F. Starks, Sr., advised Franklin F. Starks, Jr., that certain actions by the Federal Government, coupled with the then high level of 19 interest rates, made it advisable to delay any *48 thought of major capital improvements. He also suggested that questions raised by a recent Internal Revenue Service audit with respect to the Capital Items Reserve Fund be settled. Franklin Starks, Jr., was also advised by Maynard Hokanson during April 1966 that petitioner should purchase the Fenley property so that any new building built on the McDowell property would have adequate parking facilities. After continuing negotiations the Fenley property was acquired in October 1967 for $70,000. The Fenley Building was at least partially rented at the time petitioner acquired it and petitioner has continued to rent it out up to the present time. Petitioner's records do not show any amount owed on the purchase of the Fenley Building as of December 31, 1967. In 1966 a fully automatic elevator was installed in the McDowell Building at a cost of $13,490. In 1967 the building was painted at a cost of $3,000 and the parking area was paved at a cost of $1,000. Petitioner's records do not show any amount owed for the improvements to the McDowell Building as of December 31, 1966 or December 31, 1967. In October 1966 petitioner's directors authorized the purchase for $150,000 of all *49 of the outstanding shares of Corwal, Inc., the owner of the lot on the northwest 20 corner of Third and Walnut Streets, measuring 80 feet on Third Street and 60 feet on Walnut Street. Payment was made in 1966. Plans for liquidation of Corwal, Inc., were also adopted in 1966. Petitioner's records do not show any amount owed on December 31, 1966, or any time thereafter for the purchase of the Corwal, Inc. stock. In July 1967 an unsuccessful attempt was made to purchase the next adjoining lot to the north of the Starks Parking Center addition, known generally as the "Christian Observer" property. The addition to the Starks Parking Center which was constructed in 1969 was designed so that the addition could be integrated with any future addition located on the "Christian Observer" site. As of the date of the trial in this case, petitioner would, if possible, purchase the "Christian Observer" property, even though there is excess parking capacity in the Starks Parking Center, if that property could be purchased for $250,000. Between October and December 1967, negotiations were undertaken between petitioner and James Morris, president of Morris Motors for the lease of the Morris *50 Garage, a parking facility directly across Third Street from the Starks Parking Center. Petitioner had prepared an 8-page lease which included an option to purchase the garage on 21 February 1, 1968, for the sum of $137,500 payable in five annual installments of $27,500. The lease was never executed. During 1967 and 1968 discussions were held by petitioner's officers with Neville Blakemore, a member of the "space requirements" committee of the First National Bank with regard to petitioner's developing and managing a new bank building for that bank. These discussions continued until early 1969 when petitioner was informed of the size of the building desired by the First National Bank. The size of the building desired by the First National Bank was greater than petitioner considered feasible for it to finance. Of the approximately ten meetings held with Neville Blakemore concerning the First National Bank's requirements, two were held in 1967. The First National Bank was, at the time of the trial of this case (September 1972), building a 40-story building containing approximately 700,000 square feet. In June 1968, a Louisville architectural firm was employed by petitioner *51 to prepare schematic outline specifications plans and cost estimates for an office building with a bank as a key tenant for the McDowell site. The architects prepared a 14-page study which envisioned three possible types of buildings with parking facilities to be constructed on the McDowell site. Two of the three 22 plans submitted contemplated petitioner's acquiring property adjoining the McDowell and Fenley sites to the east for parking. The architect strongly recommended that the adjacent property be purchased. Three separate recommendations were developed. The first, referred to as Scheme A, envisioned a bank at ground level, parking above the bank, an office tower above the parking area, and a drive-in window at grade level. Total leasable office-type space was to be 187,500 square feet with a gross area of 335,650 square feet. This scheme utilized the McDowell and Fenley sites plus the two adjacent properties, the Ross and Graff properties. The additional land was needed to allow automobiles to reach the garage parking levels by way of a ramp. Petitioner did not own the Ross and Graff properties during 1966, 1967, 1968, or 1969. Scheme B envisioned two buildings with *52 a total leasable area of 302,635 square feet and a gross area of 358,645 square feet. Parking facilities for 348 cars utilizing 121,200 square feet were planned. This scheme also envisioned a bank as the key tenant. It was recommended that the Ross, Graff, and Lusky properties be acquired.These three separate properties are approximately the same size or larger than the McDowell and Fenley sites. The Lusky property 23 was not owned by petitioner in 1966, 1967, 1968, or 1969. Scheme C envisions an L-shaped building with a bank on the ground floor and an office tower above. This plan called for 296,650 square feet or leasable office space and 334,100 square feet of gross office area. Parking for 348 cars utilizing 121,200 square feet was planned under scheme C. This scheme also called for petitioner's acquisition of the Ross, Graff, and Lusky properties. The architect also made recommendations concerning how the various properties owned by petitioner might be tied together. He indicated a plan whereby the second floor could be bridged from the McDowell property over Third Street and Walnut Street to the Corwal property, which in turn could be tied into the Starks Parking *53 Center and the Starks Building by use of a network of pedestrian walkways. Prior to, during, and subsequent to the years at issue, each of petitioner's separate properties including the Starks Building, the Starks Parking Center, the McDowell Building, and the Corwal Building, showed a profit before depreciation. The Starks Building and the Starks Parking Center each produced a net profit. During 1966 and 1967 petitioner received income from tax-exempt interest in the amounts of $25,012 and $22,803, respectively, and from dividends in the amounts of $96,578 and $100,265. 24 At December 31 of each of the years 1962 through 1967 petitioner's Capital Items Reserve Fund consisted of securities and cash to be invested with cost bases and fair market values as follows: Year
Cost
Fair market value
1962
$1,628,110
$ 1,992,000
1963
1,882,779
2,440,132
1964
2,215,605
2,870,665
1965
2,441,815
3,205,758
1966
2,603,360
3,073,954
1967
2,777,987
3,599,041
On October 23, 1963, petitioner's board of directors established a Mortgage Retirement Fund. The mortgage on the Starks Building was held by Equitable and it required a payment of $25,000 per *54 year. On the note's maturity on January 1, 1975, a balloon payment in the amount of $500,000 was due. The purpose of the Mortgage Retirement Fund was to pay this balloon payment, or in the alternative, be invested in the erection of a new building. The assets in the Mortgage Retirement Fund were marketable securities. Petitioner's investment committee approved the buying and selling of these securities. The Kentucky Trust Co. was agent. At December 31 of each of the years 1963 through 1967, petitioner's Mortgage Retirement Fund consisted of securities and cash to be invested with cost bases and fair market values as follows: 25 Year
Cost
Fair market value
1963
$ 41,667
$ 42,842
1964
83,333
89,676
1965
125,000
142,308
1966
166,667
171,678
1967
161,201
208,220
Petitioner's quick, liquid or available funds at December 31 of each of the taxable years 1962 through 1967, including the fair market values of the securities of the Capital Items Reserve Fund and the Mortgage Retirement Fund are as follows: 26 1962
1963
1964
Cash
$ 41,790
$ 117,364
$ 116,045
U.S. Treasury bills
Notes and accounts receivable
14,747
6,269
6,453
Inventories
954
1,007
686
Prepaid insurance
6,347
6,297
5,622
Investment in subsidiaries
Investment in securities at cost
1,858
1,858
1,858
Note receivable from officer
3,439
6,878
Capital Items Reserve Fund
1,992,000
2,440,132
2,870,665
Mortgage Retirement Fund
42,842
89,676
Total liquid, quick, available funds
$2,057,696
$2,619,208
$3,097,883
*55 1965
1966
1967
Cash
$ 73,056
$ 22,786
$ 39,804
U.S. Treasury bills
128,546
Notes and accounts receivable
9,503
7,245
10,198
Inventories
1,013
1,070
900
Prepaid insurance
5,742
7,644
8,662
Investment in subsidiaries
1,000
1,000
Investment in securities at cost
1,858
1,858
1,858
Note receivable from officer
10,317
13,750
17,130
Capital Items Reserve Fund
3,205,758
3,073,954
3,599,041
Mortgage Retirement Fund
142,308
171,678
208,220
Total liquid, quick, available funds
$3,578,101
$3,300,985
$3,886,813 27 At December 31 of each of the taxable years 1962 through 1967, petitioner's current liabilities as shown on its income tax returns and financial statements are as follows: 28 1962
1963
1964
1965
1966
1967
Accounts payable
$ 20,188
$ 20,115
$ 17,550
$ 20,922
$ 30,021
$ 66,119
Notes on
17,173
mortgages payable
(less than one
year
Demand loans
275,000
250,000
Note to trustees
6,000
6,000
6,000
6,000
6,000
6,000
re Cornelia G.
Kelley
Accrued salaries
7,520
8,805
915
1,740
1,882
2,118
and wages
Accrued taxes
88,726
92,021
92,708
87,384
88,885
94,055
(other than
income)
Prepaid rent
416
1,562
997
1,506
1,526
1,881
Federal and state
133,410
203,672
201,902
178,998
132,780
124,315
income taxes
Total current
$273,433
$332,175
$320,072
$296,550
$536,094
$544,488
liabilities
*56 29 Petitioner's net current, liquid, quick or available assets at December 31 of each of the years 1962 through 1967 are as follows. Year
Liquid or
Liquid
Net available funds,
quick assets
liabilities
net quick assets or net
liquid assets
1962
$2,057,696
$273,433
$1,784,263
1963
2,619,208
332,175
2,287,033
1964
3,097,883
320,072
2,777,811
1965
3,578,101
296,550
3,281,551
1966
3,300,985
536,094
2,764,891
1967
3,886,813
544,488
3,342,325
Working capital ratios, or the ratio of a quick, liquid or available funds to liquid liabilities at December 31 of each of the years 1962 through 1967 are as follows: Year
Ratio
1962
7.5
1963
7.9
1964
9.7
1965
12.1
1966
6.2
1967
7.1
The increases and decrease of net liquid or available funds at December 31 of each of the years 1963 through 1967 are as follows. Year
Increase or
(decrease)
1963
$502,770
1964
490,778
1965
503,740
1966
(516,660)
1967
577,434 30 The decrease of net liquid or available funds at December 31, 1966, was caused in part by the payment of $125,000 cash plus the execution of a $275,000 demand note *57 for the purchase of the McDowell Building in March 1966 and payments for the purchase of the Corwal, Inc., stock for $160,000. The Fenley Building was purchased for $70,000 in 1967 and the McDowell demand note was reduced to $250,000 by December 31, 1967. Petitioner's normal yearly operating expenses for each of the years 1962 through 1967 are as follows: 31 1962
1963
1964
Cost of operations
$ 543,549.91
$ 500,165.00
$ 522,381.97
Compensation of officers
59,146.32
55,407.16
54,356.66
Salaries and wages (not deducted
15,898.50
16,812.09
16,481.50
elsewhere)
Bad debts
184.81
2,084.42
349.72
Rents
7,577.46
13,261.46
10,261.46
Taxes (other than Federal income)
131,755.32
143,505.47
147,337.99
Interest
36,688.96
33,091.85
31,300.00
Contributions
5,001.10
3,886.00
4,174.33
Advertising
546.54
241.08
539.43
Pension
Other employee benefit plans
Other deductions
29,435.53
20,437.94
20,959.94
Federal income tax
179,658.17
226,014.16
237,966.47
Total yearly operating expenses
$1,009,442.62
$1,014,906.63
$1,046,109.47
1965
1966
1967
Cost of operations
$ 500,930.53
$ 532,675.00
$ 527,105.00
Compensation of officers
53,237.37
34,046.00
36,058.00
Salaries and wages (not deducted
9,179.84
9,756.00
10,022.00
elsewhere)
Bad debts
30.00
74.00
81.00
Rents
10,261.46
10,250.00
10,339.00
Taxes (other than Federal income)
143,964.77
146,254.00
154,662.00
Interest
30,300.00
4 0,785.00
43,412.00
Contributions
3,140.00
3,415.00
3,399.00
Advertising
Pension
3,800.00
Other employee benefit plans
21,474.00
Other deductions
20,549.03
21,917.00
16,019.00
Federal income tax
250,153.50
235,727.00
247,072.00
Total yearly operating expenses
$1,021,746.50
$1,034,899.00
$1,073,443.00
*58 32 Petitioner's gross receipts from the operation of its properties for the period 1962 through 1967 were as follows: 33 Starks Building
Year
Rental
Service
Parking
McDowell and
Total
Center
301 Buildings
1962
$1,087,774.59
$ 85,911.48
$169,673.05
-
$1,343,359.12
1963
1,116,845.47
96,508.09
164,883.60
-
1,378,237.16
1964
1,129,252.4 5
94,712.23
176,504.21
-
1,400,468.89
1965
1,150,700.68
96,472.23
180,955.47
-
1,428,128.38
1966
1,157,626.00
90,119.00
187,788.00
$32,773.00
1,468,306.00
1967
1,167,643.00
102,035.00
192,171.00
65,672.00
1,527.521.00 34 From 1940 to 1972, petitioner's dividends increased from $12.50 a share to $65.00 a share. The dividends paid in 1966 and 1967 were $63 and $65, respectively. For the years 1966 and 1967, the book income, total dividends paid, and additional funds per share not distributed as dividends are as follows: 1966
1967
Book income
$350,432
$370,679
Dividends
155,320
160,251
Net
$195,112
$210,428
Total outstanding shares (rounded to full share)
2,465
2,465
Additional funds per share
$79
$85
The shareholders *59 or owners of beneficial interests of petitioner, number of shares held by each, reported adjusted gross income, reported long-term capital gain, reported taxable income, appropriate tax rate, funds of petitioner not distributed allocated to each shareholder, and the additional tax which each shareholder would have paid if all of petitioner's book income had been distributed and no other changes occurred in its income for the years 1966 and 1967 are as follows: 35 Year
Number
Adjusted
Long-Term
Taxable
Shares Held
Gross
Capital
Income
Income
Gain
John S. Rodes
1966
194-1/2
$ 62,316
--
$ 52,732
1967
194-1/2
65,736
--
57,005
Joe B. Rodes
1966
174-1/2
25,012
--
18,613
1967
174-1/2
24,807
--
18,170
Stannye R.
1966
179
42,778
$ 3,342
31,951
Reutlinger
1967
179
31,337
2,094
17,897
Susan R. Embry
1966
171
18,667
--
15,982
1967
171
19,773
--
17,262
Effie S. Weller
1966
12-1/2
10,715
--
6,582
1967
12-1/2
11,998
506
7,749
Richard B.
1966
12-1/2
8,106
--
5,495
Starks
1967
12-1/2
23,042
2,776
20,242
John Burgin, Jr.
1966
60
14,730
--
11,324
1967
60
16,322
--
12,757
Cornelia G.
1966
240
38,444
738
27,677
Kelley
1967
240
42,762
4,119
32,866
Louisa S. Allen
1966
189
45,339
--
36,232
1967
189
47,087
--
37,446
Lucy B. Holt
1966
42-1/2
6,592
599
3,737
1967
42-1/2
8,427
90
5,673
Sophia B. Moore
1966
85
31,339
262
19,346
1967
85
33,210
185
27,573
Florence B.
1966
60
2,479
59
635
Bailey
1967
60
4,773
118
3,040
Franklin F.
1966
236
124,595
35,897
108,590
Starks, Sr.
1967
236
94,593
2,150
81,758
William P.
1966
5-3/5
16,599
11
12,113
Burgin
1967
5-3/5
14,589
203
8,936
Elizabeth E.
1966
13-1/2
72,074
--
60,634
Smith
1967
13-1/2
70,467
--
63,340
Sophia B.
1966
5-3/5
11,134
12
7,107
McHargue
1967
5-3/5
12,356
36
8,165
Martha B.
1966
5-3/5
10,797
200
7,997
Linville
1967
5-3/5
12,071
--
9,271
Farmers National
1966
186
--
--
--
Bank Trustee u/w
J. Waller Rodes
1967
186
--
--
--
John P. Starks
1966
518
--
--
--
Trust Re John P.
Starks
1967
518
73,874
--
19,717
Stock Not
1966
74-1/5
Allocable to
Known Returns
1967
74-1/5
Total Shares
1966
2,465
Outstanding
1967
2,465
*60 1966
1967
Tax Rate
$79 Per
Additional
$85 Per
Additional
Share
Tax
Share
Tax
John S. Rodes
53%
$15,365.50
$ 8,143.72
53%
$16,532.50
$ 8,762.22
Joe B. Rodes
28%
13,785.50
3,859.94
28%
14,832.50
4,153.10
Stannye R.
39%
14,141.00
5,514.99
Reutlinger
28%
15,215.00
4,260.20
Susan R. Embry
39%
13,509.00
5,268.51
42%
14,535.00
6,104.70
Effie S. Weller
25%
987.50
246.88
23%*
1,062.50
244.38
Richard B.
19%
987.50
187.62
Starks
32%
1,062.50
340.00
John Burgin, Jr.
22%
4,740.00
1,042.80
25%
5,100.00
1,275.00
Cornelia G.
36%
18,960.00
6,825.60
Kelley
42%
20,400.00
8,568.00
Louisa S. Allen
55%
14,931.00
8,212.05
55%
16,065.00
8,835.75
Lucy B. Holt
19%
3,357.50
637.92
22%
3,612.50
794.75
Sophia B. Moore
45%
6,715.00
3,021.75
53%
7,225.00
3,829.25
Florence B.
14%
4,740.00
663.60
Bailey
19%
5,100.00
969.00
Franklin F.
55%
18,644.00
10,254.20
Starks, Sr.
58%
20,060.00
11,634.80
William P.
25%
442.40
110.60
Burgin
22%
476.00
104.72
Elizabeth E.
53%
1,066.50
565.24
Smith
53%
1,147.50
608.18
Sophia B.
19%
442.40
84.06
McHargue
22%
476.00
104.72
Martha B.
19%
442.40
84.06
Linville
22%
476.00
104.72
Farmers National
20%
14,694.00
2,938.80
Bank Trustee u/w
J. Waller Rodes
20%
15,810.00
3,162.00
John P. Starks
45%
40,922.00
18,414.90
Trust Re John P.
Starks
45%
44,030.00
19,813.50
Stock Not
Allocable to
Known Returns
Total Shares
Outstanding
Totals
$76,077.24
$83,668.99
*61 36 According to the Marshall and Stevens Index, the cost of replacement of a fireproof steel frame building in the central United States has increased since 1948 as follows: Year
Percentage Increase In
Replacement Cost Since
1948
1948
0
1950
5.66
1951
18.08
1952
19.91
1953
24.49
1954
28.49
1955
34.45
1956
40.17
1957
45.49
1 958
48.55
1959
52.78
1960
53.97
1961
54.66
1962
57.22
1963
60.32
1964
63.78
1965
68.16
1966
75.21
1967
82.16
1968
92.36
1969
107.34
An audit of petitioner's books and records by an Internal Revenue agent was made in 1965 for the taxable years 1963 and 1964. The possibility of the accumulated earnings tax being imposed for those years was raised by the agent and this matter was brought to the attention of petitioner's board of directors. 37 Respondent, acting through the supervisor of the revenue agent who conducted the audit, decided against asserting the accumulated earnings tax against petitioner for the taxable years 1963 and 1964. On or about February 18, 1971, respondent notified petitioner by certified mail that he proposed to issue *62 a notice of deficiency for the taxable years here in issue, setting forth an amount with respect to section 531 relating to the accumulated earnings tax. Petitioner timely submitted a statement purporting to comply with section 534(c). Respondent, in his notice of deficiency dated July 21, 1971, determined that petitioner was availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed during the taxable years 1966 and 1967. Accordingly, respondent determined deficiencies in petitioner's income tax for each of these years which included the accumulated earnings tax under section 531 for each year. 38 OPINION Section 531[2] imposes an accumulated earnings tax on corporations (described in section 532) "formed or 39 availed of for the purpose" of avoiding the income tax as to its shareholders by permitting earnings and 40 profits to accumulate rather than being divided or distributed. Section 533 provides that the fact that earnings and profits are permitted *63 to accumulate "beyond the reasonable needs of the business" shall be determinative of the purpose to avoid income tax of its shareholders unless petitioner can prove to the contrary by a preponderance of the evidence. Section 537 defines the term "reasonable needs of the business" to include the "reasonably anticipated" needs of such business. *64 41 Section 534 provides for circumstances in which the burden of proof regarding the reasonable needs of the business is placed on respondent. Respondent has complied with the notification requirement of section 534(b) and petitioner has filed a statement purporting to comply with section 534(c) in that it sets forth certain grounds to justify its earnings accumulations. Respondent contends that petitioner's statement filed pursuant to section 534(c) is insufficient in that (1) dollar amounts of net working capital against which reasonable needs are to be compared were not shown and total dollar amounts of the alleged reasonable needs of the business were not set forth and are not determinable; (2) no specific grounds were set forth by petitioner; and (3) facts sufficient to show the basis of grounds were not presented. Petitioner contends that it has set forth three grounds in its statement submitted pursuant to section 534(c): (1) petitioner needed to establish a "Capital Items Reserve Fund" for the purpose of having the necessary funds available to build either a replacement or succession to the Starks Building; (2) an accumulation of earnings and profits was necessary *65 to provide 42 funds for the maintenance and upkeep of the Starks Building; and (3) accumulations were necessary to provide funds for the improvement of the office building. We find it unnecessary to determine whether petitioner's statement was sufficient to shift the burden of going forward with evidence to respondent. Assuming the burden remained on petitioner, in our view for reasons hereinafter set forth, this record is sufficient to carry petitioner's burden of showing that the accumulations were not in excess of the reasonable needs of its business at the end of each of the years here in issue. Petitioner maintains that its earnings were accumulated to provide funds to build a replacement for or successor to the Starks Building, and, in the alternative, to renovate the Starks Building itself. The respondent contends that during the taxable years in issue, petitioner's plans for its proposed new building had not developed to the point of being "specific, definite, and feasible" but were, to the contrary, "uncertain or vague." Section 1.537-1(b), Income Tax Regs.
In our view, the resolution of this issue is determinative of whether the accumulated *66 earnings tax should be imposed against petitioner. For whether or 43 not the accumulated earnings tax is to be imposed against petitioner depends, in large measure, upon whether petitioner during the years here in issue was firmly committed to a course of action which would bring about the transformation of the securities in the Capital Items Reserve Fund into brick, mortar and steel within a reasonable period of time. If, as respondent contends, the plans for the replacement building had not sufficiently crystallized or met the other requirements of the regulations, then, in our view, there is no question that petitioner had quick funds in excess of its needs or reasonably anticipated needs which were specific, definite, and feasible. Respondent includes in his totals of petitioner's quick assets the marketable securities contained in the Capital Items Reserve Fund. Petitioner presented expert testimony to the effect that because the fund was segregated on the corporate books, income tax returns, and financial statements, the fund was not a current asset. Petitioner further emphasizes that even though the assets in the fund were legally available to petitioner for general *67 corporate purposes, the funds were not so treated by petitioner's board of directors 44 but have been drawn upon only occasionally and solely for major capital expenditures. Petitioner does not object to the items included in respondent's determination of quick assets with the exception of the Capital Items Reserve Fund. We agree with respondent's position that the value of marketable securities held by a corporation should be included in determining that corporation's quick assets to the extent that the securities are not essential to the corporation's business. If the needs and reasonably anticipated needs of the corporation do not require the retention by petitioner of the investment securities in the Capital Items Reserve Fund, the value of these investment securities which are readily marketable must be included in a computation of total quick assets of petitioner. Moreover, the value of these securities should be determined by market value as of the end of each taxable year in issue rather than at cost as urged by petitioner. While there are some decisions of other courts to the contrary, we squarely faced this issue in the supplemental opinion of Golconda Mining Corp., 58 T.C. 736 (1972), *68 on appeal (C.A. 9, Nov. 15, 1972), and held that market value rather than cost is the proper measure. Accordingly, our findings reflect a market valuation. 45 Petitioner's liquid liabilities, that is, those obligations due within one year, are set out in our findings of fact together with a schedule listing the net liquid assets of petitioner for the taxable years 1962 through 1967. Respondent concedes that petitioner needed at the end of each taxable year in issue liquid funds sufficient to pay 3 months' operating expenses. Respondent also concedes that petitioner had a need at the end of 1966 for $233,400 and a need at the end of 1967 for $269,500 in order to be able to pay off the balloon payment of $500,000 due in 1975. Furthermore, respondent concedes that petitioner had a need for $135,000 as of December 31, 1967, to purchase land to the north of and adjacent to the Starks Parking Center. Petitioner argues that it needed a year's operating funds and in addition needed not only the items conceded by respondent to be needed but also an amount to pay off the note on the McDowell Building, to purchase the stock of Corwal, Inc., and to purchase the Fenley Building, *69 as well as to finance construction of a new building. It is obvious from the facts we have found that even on the basis of petitioner's contentions, its 46 earnings had been permitted to accumulate beyond the reasonable needs of its business unless it had a reasonable need for funds to finance the construction of a new building. It is therefore necessary for us to determine the principal issue in this case of whether a reasonably anticipated future need of petitioner's business as of the end of each of the years here in issue was the accumulation of sufficient earnings and profits to finance the construction of a new office building. If petitioner did have such a reasonably anticipated future need, it is obvious that its accumulated earnings and profits were not at the end of each of the years here in issue sufficient to meet this need. Section 1.537-1(b), Income Tax Regs., provides as follows: (b) Reasonable anticipated needs. (1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there *70 must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation.Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to 47 the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business. (2) Consideration shall be given to reasonably anticipated needs as they exist on the basis of the facts at the close of the taxable year. Thus, subsequent events shall not be used for the purpose of showing that the retention of earnings or profits was unreasonable *71 at the close of the taxable year if all the elements of reasonable anticipation are present at the close of such taxable year. However, subsequent events may be considered to determine whether the taxpayer actually intended to consummate or has actually consummated the plans for which the earnings and profits were accumulated. In this connection, projected expansion or investment plans shall be reviewed in the light of the facts during each year and as they exist as of the close of the taxable year. If a corporation has justified an accumulation for future needs by plans never consummated, the amount of such an accumulation shall be taken into account in determining the reasonableness of subsequent accumulations. The first requirement of the regulations is that the future needs cannot be uncertain or vague. Petitioner forcefully points out that the Starks Building is over 50 years old and that it must be replaced or at least substantially renovated. Sufficient evidence 48 has been presented to show the validity of this need: The market survey which petitioner received when it purchased the McDowell Building revealed that a substantial number of the major tenants in the Starks *72 Building contemplated terminating their leases if a more modern office building were constructed in downtown Louisville. The second requirement of the regulations is that the plans for the future use of an accumulation must be specific, definite, and feasible. In American Metal Products Corporation, 34 T.C. 89, 101 (1960), affd. 287 F.2d 860 (C.A. 8, 1961), in examining the taxpayer's alleged plans for expansion, we stated that: The record does not show that any outside consultant, architect, realtor, or contractor was engaged in order to give their plans some semblance of clarity, specificity, and actuality. There were no independent estimates on which petitioners might reasonably have relied as a reason for accumulating earnings in the scale and manner in which they accumulated them. * * * However, the application of this rule must be tempered by the peculiar facts relating to the corporation in question. In Faber Cement Block Co., 50 T.C. 317 (1968), the taxpayer was contemplating expanding one of its 49 factories. In finding that the plans for expansion met the requirements of the regulations, we stated at 332 as follows: *73 We also recognize that petitioner's plans for expansion were not set forth in the minutes or other documentary material with precision or in detail. But the requirement of "specific, definite, and feasible" plans does not demand that the taxpayer produce meticulously drawn, formal blueprints for action. [8] John P. Scripps Newspapers, supra at 469. The test is a practical one, namely, that the contemplated expansion appears to have been "a real consideration during the taxable year, and not simply an afterthought to justify challenged accumulations." See Smoot Sand & Gravel Corporation v. Commissioner, supra at 499. The decided cases, which admittedly cover a variety of factual situations, indicate that in applying this test the courts primarily take into account evidence of actual implementation in evaluating the specificity of plans as they existed during the critical period, provided that some evidence of plans is adduced. Compare and contrast F. E. Watkins Motor Co., 31 T.C. 288 (1958), and Breitfeller Sales, Inc., 28 T.C. 1164 (1957), with Barrow Manufacturing Co. v. Commissioner, 294 F.2d 79 (C.A. 5, 1961), affirming a Memorandum *74 Opinion of this Court, Dixie, Inc. v. Commissioner, 277 F.2d 526 (C.A. 2, 1960), affirming 31 T.C. 415 (1958), I. A. Dress Co. v. Commissioner, 273 F.2d 543 (C.A. 2, 1960), affirming 32 T.C. 93 (1959), and American Metal Products Corporation v. Commissioner, 287 F.2d 860 (C.A. 8, 1961), affirming 34 T.C. 89 (1960). 50 It appears from the record that it would have been a waste of time and money for petitioner to have prepared detailed blueprints and budgets before it secured a long-term lease with an anchor tenant. Although respondent asserts that petitioner could have begun the actual erection of a new building and then found a principal tenant, the testimony of the bank president that any building built for his bank would be built according to the bank's specifications completely refutes respondent's assertion. *75 If petitioner was justified in insisting upon a commitment from an "anchor tenant," that is, a principal long-term tenant that would occupy a substantial proportion of the new building prior to beginning construction of a new building, as it appears petitioner did, we must then determine whether petitioner exerted a sufficient effort during the years here in issue to find an anchor tenant. It has been stated many times that a court should be most reluctant to substitute its business judgment for that of corporate management unless the facts and circumstances, buttressed (in the absence of a proper statement under section 534) by the presumptive correctness of respondent's determination, dictate that it 51 should do so. Faber Cement Block Co., supra at 329; and Bremerton Sun Publishing Co., 44 T.C. 566, 583 (1965). The record shows that Equitable was willing to extend a loan to petitioner for a new building which would have a bank as a principal tenant at satisfactory interest rates.The presence of a long-term, stable tenant practically insured the regularity *76 of rent payments being made to petitioner and petitioner's being able to make regular mortgage loan payments to Equitable. The absence of such a tenant would increase the risk of default by petitioner to its lender and accordingly it would be required to pay a higher rate of interest on its mortgage loan. The record also shows that the Starks Building itself had a history of low occupancy rates during the first few decades of its existence and that during the early years of the depression petitioner was unable to pay a dividend after it met its expenses, including mortgage payments. These facts justify the reluctance of petitioner's board of directors to authorize construction of a new building without the firm commitment of a long-term lease for a substantial portion of the building. 52 The second question with respect to this issue is whether petitioner exerted sufficient effort to secure an "anchor tenant." The record shows that petitioner conducted negotiations with both the Citizens Bank and the First National Bank. The record shows that these negotiations were frank, serious discussions of the possibilities of petitioner's erecting and operating buildings for the respective *77 banks. Respondent characterizes these discussions as vague and petitioner's aspirations as mere pipedreams, noting that the discussions with Citizens were all but abandoned by 1966 and that the discussions with First National did not begin until 1967. The fact remains, though, that petitioner was not altered from its course of actively seeking out a prime tenant. Furthermore, as petitioner points out, the primary reason that petitioner was not chosen by Citizens and by First National was the fact that petitioner did not have the financial capability to finance such large buildings. In other words, petitioner had not accumulated sufficient reserves to pay the immediate costs which would be required for the construction of a relatively large office building. 53 In summary, we find that petitioner in the years here in issue was taking active steps to carry out its plan of expansion. It was attempting to find an anchor tenant and was, until after the close of the years here in issue, actively negotiating with a bank to build a specific building. In our view, even if negotiations with one bank effectively ended in 1966 and negotiations with the other bank did not begin until *78 1967, the time lapse was not sufficient to indicate an abandonment by petitioner of active efforts to build a specific building for a specific anchor tenant. Finally, respondent argues that the accumulations made by petitioner were in excess of its needs even though its plans for building a new building could be considered specific, definite, and feasible. Petitioner's directors were committed to a conservative plan of financing their new building and would prefer to borrow no more than one-half of the total cost of the new building. A corporation is free to choose the method of financing its plans for expansion. Bremerton Sun Publishing Co., supra.The choice of adhering to a conservative financial structure is a legitimate one for petitioner's management to make. 54 Petitioner has also introduced sufficient evidence to justify the accumulations which existed as of December 31, 1966, and December 31, 1967, in terms of the accelerating cost of constructing office buildings. The Marshall and Stevens cost index shows how rapidly costs of building construction have increased, especially during the years in issue. On the basis of the facts present for the years *79 here in issue we conclude that petitioner's entire amount of accumulated earnings and profits at the end of each of the years 1966 and 1967 was required by the reasonable needs of its business. We are not called upon to, nor do we determine how long petitioner might have to use its accumulated funds to build a new office building after it was unsuccessful in obtaining the contract for the building for the First National Bank. At the end of the last year here in issue petitioner was conducting serious negotiations to be selected to build a building with the First National Bank as an anchor tenant. Under section 1.537-1(b) (2), Income Tax Regs., it is the "anticipated needs as they exist on the basis of the facts at the close of the taxable year" 1966 and the taxable year 1967 which we are called upon to determine. The last sentence of section 1.537-1(b) (2) states that "[if] a corporation has justified an accumulation 55 for future needs by plans never consummated, the amount of such an accumulation shall be taken into account in determining the reasonableness of subsequent accumulations." Inherent in this statement is the assumption that some accumulations *80 will be justified on the basis of future needs supported by plans that are never consummated and that the reasonableness of future accumulations will be judged on the basis of the facts present in those subsequent years.
In light of the credit provided for in section 535(c) (1) and our determination that the entire amount of the accumulations at the end of each of the years here in issue was required for the reasonable needs of petitioner's business, it is unnecessary for us to consider whether petitioner had the proscribed purpose of avoiding income tax for its shareholders. Faber Cement Block Co., supra at 336. Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954, as amended.↩
1. Apparently Mary Holt, Preston Burgin, Anna Sallee, and John Burgin were beneficiaries of the Estate of John P. Starks. ↩
*. Filed as head of household in 1967 ↩
2. Secs. 531 through 535 and sec. 537, I.R.C. 1954, provide insofar as here pertinent: SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of - (1) 27-1/2 percent of the accumulated taxable income not in excess of $100,000 plus (2) 38-1/2 percent of the accumulated taxable income in excess of $100,000. SEC 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule. - The accumulated earnings tax imposed by section 531 shall apply to every corporation * * * formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed. * * * SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable Accumulation Determinative of Purpose. - For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary. * * * SEC. 534. BURDEN OF PROOF. (a) General Rule. - In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall - (1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or (2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection. (b) Notification by Secretary. - Before mailing the notice of deficiency referred to in subsection (a) the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. * * * (c) Statement by Taxpayer. - Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. * * * SEC. 535. ACCUMULATED TAXABLE INCOME. (a) Definition. - For purposes of this subtitle, the term "accumulated taxable income" means the taxable income, adjusted in the manner provided in subsection (b), minus * * * the accumulated earnings credit (as defined in subsection (c)). (b) Adjustments to Taxable Income. - For purposes of subsection (a), taxable income shall be adjusted as follows: (1) Taxes. - There shall be allowed as a deduction Federal income and excess profits taxes * * * accrued during the taxable year * * * * * * (c) Accumulated Earnings Credit. - (1) General rule. - For purposes of subsection (a), in the case of a corporation * * * the accumulated earnings credit is (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business, * * * (2) Minimum credit. - The credit allowable under paragraph (1) shall in no case be less than the amount by which $100,000 exceeds the accumulated earnings and profits of the corporation at the close of the preceding taxable year. * * * SEC. 537. REASONABLE NEEDS OF THE BUSINESS. For purposes of this part, the term "reasonable needs of the business" includes the reasonably anticipated needs of the business. ↩
8. For petitioner to have prepared blueprints and detailed budgets before the granting of the variance appeared imminent could well have entailed unnecessary time and expense. Cf. Sterling Distributors, Inc. v. United States, 313 F.2d 803, 807↩ (C.A. 5, 1963).